[S.F. No. 23500. Mar. 23, 1978.]

SOUTHERN CALIFORNIA EDISON COMPANY,
Petitioner, v.
PUBLIC UTILITIES COMMISSION et al., Respondents.

814

## COUNSEL

Rollin E. Woodbury, William E. Marx, Stephen R. Reinhardt, Bodle, Fogel, Julber, Reinhardt, Rothschild & Feldman, O'Melveny & Myers, Allyn O. Kreps, Keith H. Beyler, Everett B. Clary and Louise Nemschoff for Petitioner.

Richard D. Gravelle, J. Calvin Simpson, Hector Anninos, John S. Fick, Timothy E. Treacy and Janice E. Kerr for Respondents.

## OPINION

**MOSK, Acting C. J.—** ■ By this petition for writ of review Southern California Edison Company (Edison) challenges the lawfulness of portions of Decision No. 85731 of respondent Public Utilities Commission which require it to amortize, by 36 months of billing credit to its customers, substantial overcollections generated by operation of its "fuel cost adjustment clause." Edison's principal contention is that because the funds in issue were lawfully collected pursuant to a rate structure found by the commission to be just and reasonable at the time, the order to return them constitutes illegal "retroactive ratemaking." We conclude that the contention is without merit and the decision should be affirmed.

■

If the prohibition against retroactive ratemaking is to remain a useful principle of regulatory law and not become a device to fetter the commission in the exercise of its lawful discretion, the rule must be properly understood. In *Pacific Tel. & Tel. Co.* v. *Public Util. Com.* (1965) 62 Cal.2d 634 [44 Cal.Rptr. 1, 401 P.2d 353] (hereinafter *Pacific Tel. & Tel.*), the first decision of this court on the question,[1] we construed Public Utilities Code section 728 to vest the commission with power to fix rates prospectively only.[2] But we did not require that each and every act of the commission operate solely in futuro; our decision was limited to the act of promulgating "general rates." Thus we held (at p. 650 of 62 Cal.2d) that "the Legislature has not undertaken to bestow on the commission the power to roll back *general rates* already approved by it under an order which has become final, or to order refunds of amounts collected by a public utility pursuant to such approved rates and prior to the effective date of a commission decision ordering a *general rate* reduction." (Italics added.) And we concluded by reaffirming (at p. 655) "the rule that *general rate making* is legislative in character and looks to the future." (Italics added.)

*Pacific Tel. & Tel.* was precisely such a general ratemaking case. There the commission conducted an extensive investigation of the rates charged by the utility in question, found them to be unreasonably high, and fixed new lower rates. In addition, however, the commission ordered the utility to refund to its customers all charges collected in excess of the new rate level since the beginning of the investigation. The order, of course, resulted in the new general rate structure taking effect retroactively, a disposition which we ruled beyond the statutory power of the commission.[3]

---

[1] The Public Utilities Commission and its predecessor, the California Railroad Commission, had long before recognized and applied the rule against retroactive ratemaking. (See, e.g., *Re Pacific Tel. & Tel. Co.* (1949) 48 Cal.P.U.C. 823, 836-837, and cases cited.)

[2] Section 728 provides in pertinent part that "Whenever the commission, after a hearing, finds that the rates . . . collected by any public utility for or in connection with any service . . . are insufficient, unlawful, unjust, [or] unreasonable . . . the commission shall determine and fix, by order, the just, reasonable, or sufficient rates . . . to be thereafter observed and in force."  .

[3] *Pacific Tel. & Tel.* relied on a number of decisions of federal courts and our sister states which likewise held that rate-fixing orders could operate only prospectively. (62 Cal.2d at pp. 650-652.) But an examination of each shows that all involved various types of general rate orders and none remotely resembled the situation now before us.

The second decision of this court applying the rule against retroactive ratemaking was *City of Los Angeles* v. *Public Utilities Commission* (1972) 7 Cal.3d 331 [102 Cal.Rptr. 313, 497 P.2d 785] (hereinafter *City of Los Angeles I*). There the commission, after full hearings, found a utility's rates to be unreasonably low and fixed new higher rates. We issued a stay permitting the increased rates to be collected subject to refund pending our ruling on the petition for writ of review. In due course we annulled the decision, while recognizing that some rate increase was justified. The utility requested that we remand the case to the commission for the fixing of new rates and that the refunds be limited to the difference between such rates and those prescribed in the annulled decision. Again such an order would evidently have had the effect of permitting a new general rate structure to operate retroactively. We therefore reiterated the rule of *Pacific Tel. & Tel.* that "general rate making is legislative and looks to the future" (7 Cal.3d at p. 338), and directed refund of the entire rate increase. (*Id.* at pp. 356-357.)

We question neither the rule stated in the foregoing decisions nor its application to the facts there presented. But this is not such a case. At the risk of belaboring the obvious, we observe that before there can be retroactive ratemaking there must at least be *ratemaking*. There undoubtedly was ratemaking in both *Pacific Tel. & Tel.* and *City of Los Angeles I*; as we shall explain, however, ratemaking within the meaning of the cited decisions did not occur in the case at bar.

We begin with a review of the factual and legal background of this dispute. In a general rate proceeding in 1971 the commission granted Edison a rate increase of $105.5 million so that it might realize a return of 7.9 percent in the test year 1972. (*Re So. Cal. Edison Co.* (1971) 72 Cal.P.U.C. 282, 317.) The commission's estimate for Edison's cost of fuel in 1972 was based on actual prices paid in the period preceding the decision. In the months following the decision, however, Edison's fossil fuel costs—together with those of all utilities—rose substantially. Edison thereupon filed an application for immediate rate relief and for authority to amend its tariff to include an adjustment clause permitting periodic future billing adjustments "to reflect future increases in the cost of fuel." The commission granted an immediate rate increase of $14.3 million, and authorized the requested fuel clause. (*Re So. Cal. Edison Co.* (1972) 73 Cal.P.U.C. 180.)

The clause operated as follows: at regular intervals Edison prepared a forecast of the quantity of fossil fuel it would need to purchase in the ensuing 12-month period under average weather conditions. It then calculated the cost of such fuel at current prices, and compared that figure with the cost of the same quantity of fuel at the prices reflected in its existing base rates. If the difference worked out to .001 cent per kilowatt-hour or more,[4] Edison notified the commission of this fact by filing an "advice letter" requesting authority to increase future billings to compensate for its predicted higher fuel expenses.

Formal hearings on such requests were not contemplated; during the period here in issue none was held, and commission approval was routinely granted. In each instance the ensuing adjustment was then a matter of simple arithmetic: on each bill the number of kilowatt-hours sold was multiplied by the "fuel cost adjustment billing factor" necessary to raise the additional revenue, and the resulting "adjustment amount" was added to the customer's monthly charge. The process was repeated in each billing until the next such adjustment was granted and took effect, and revisions of the billing factor were permitted as often as every three months. (*Id.* at pp. 184-185.)[5]

It is important to keep in mind that the periodic adjustments in Edison's rates brought about by operation of the fuel clause were intended to contain no element of profit whatever. ■ A utility's rates are essentially the sum of two distinct components: its operating expenses and its return on invested capital. "The basic principle [of ratemaking] is to establish a rate which will permit the utility to recover its cost and expenses *plus* a reasonable return on the value of property devoted to public use." (Italics added.) (*City and County of San Francisco* v. *Public Utilities Com.* (1971) 6 Cal.3d 119, 129 [98 Cal.Rptr. 286, 490 P.2d 798].) It is thus elementary regulatory law that the "return"—i.e., the profit—of the utility is calculated solely on the rate base—i.e., the capital contributed by its investors; the utility is not entitled to earn an

---

[4]To give an idea of scale, we note that at the level of Edison's operations prevailing when the fuel clause was adopted a difference of .001 cent per kilowatt-hour represented approximately $460,000. (*Id.* at p. 186.)

[5]For the theory and practice of fuel clauses generally, see Schiffel, *Electric Utility Regulation: An Overview of Fuel Adjustment Clauses* (1975) 95 Pub. Util. Fort. No. 13, page 23; Sarikas, *What is New in Adjustment Clauses, id.* at page 32; Trigg, *Escalator Clauses in Public Utility Rate Schedules* (1958) 106 U.Pa.L.Rev. 964; Comment, *The Fuel Adjustment Clause and Its Role in the Regulatory Process* (1976) 47 Miss.L.J. 302.

additional profit on its expenses, but only to "recover" them on a dollar-for-dollar basis as part of the rates. A fortiori, the same principles apply to an increase in rates resulting from operation of a fuel *cost adjustment* clause: as its name indicates, the purpose of such a clause is to permit prompt rate adjustment to offset unusual changes in fuel costs, and no portion of such a rate increase may lawfully represent a profit to the utility.

It is clear that the fuel clause in the case before us was designed to operate within the law. The commission set forth its reasons for adopting the clause in a formal finding of fact: "Edison's proposed fuel cost adjustment billing factor will be adopted because (1) in an inflationary period with rapid changes in the cost of fuel, an expedited method is required to permit a utility *to recover these costs* so that its ability to function is not impaired; (2) because fuel costs are at least 20 percent of Edison's total costs, an expedited proceeding *to recover these increases* will lessen the frequency of general rate cases; and (3) the provision enhances a utility's position in the financial community." (Italics added.) (*Re So. Cal. Edison Co.* (1972) 73 Cal.P.U.C. 180, 190.)

As the emphasized language demonstrates, the purpose of Edison's fuel clause was primarily to permit the company to "recover" its increased fossil fuel costs in an expedited manner.[6] When in the following year the commission authorized the use of a similar fuel clause by the other major California electric utilities, it reiterated that purpose each time in identical words. (*Re Pacific Gas & Electric Co.* (1973) 74 Cal.P.U.C. 781, 790-791; *Re San Diego Gas & Electric Co.* (1973) 75 Cal.P.U.C. 267, 274.) And throughout the decision now under review the commission consistently describes the purpose of such fuel clauses as "dollar for dollar reimbursement" for the increased cost of fossil fuel. (79 Cal.P.U.C. 758, 762; see also *id.* at pp. 764, 766, 773.)

Edison, however, appears to view its fuel clause as a device for accomplishing a wholly different purpose. This was made crystal clear in the lengthy testimony of Norman L. Codd, Edison's rate structure engineer and expert witness. Mr. Codd repeatedly denied that the fuel cost adjustment was an emergency measure with the limited goal of

---

[6]This reading is verified by a further finding in the decision, in which the commission declared the fuel clause would not be inflationary because "any price increases brought about by use of the fuel clause merely reflect the effect of past price inflation on the costs of fuel." (*Ibid.*)

producing just enough additional revenue to offset specific, extraordinary increases in fossil fuel expenses; speaking for his company, he described the adjustment instead as a miniature rate proceeding intended to generate whatever higher rates were deemed necessary to prevent "decay" in the utility's overall rate of return on invested capital. These views were confirmed, for example, in the following exchange between the commission examiner and Mr. Codd:

"Q. [by Examiner Blecher]. That means, Mr. Codd, it doesn't make any difference what you collect, hoping you don't exceed the rate of return that is authorized, . . . is that correct? A. That is correct.

"Q. So that the fuel clause, there is no relationship to the fuel expense, . . . isn't that the effect of what you are saying? A. We are saying that the fuel clause itself, the revenues that come from it should not be compared directly with the expenses but rather [with] the total revenues derived by the base rates . . . to determine if the rate of return that the Commission found reasonable is being attained.

"Q. And you don't need a fuel clause, you just need a general rate case each time you need a rate increase because the effect of what you are saying would ignore the base purpose of the fuel clause, that is to provide emergency funds to the utility for its immediate excessive fuel costs over that which was used in computing the rates in the last rate case, is that a fair statement, Mr. Codd? A. If the base rates could in fact be revised often enough . . . to result in a rate of return that the Commission has found reasonable, then I would say yes, we do not need a fuel clause. Unfortunately, our experience has shown otherwise.

"Q. Why do you need a fuel clause when you say that the amount of revenue that you collect under the fuel clause has absolutely no relation to the fuel expense as long as the amount of revenues do not cause you to exceed authorized rate of return? A. Without a fuel clause, the additional expenses that are incurred when we have increasing . . . fuel costs are such that *the rate of return would decay*; and we are trying to avoid that decay by . . . increasing prices." (Italics added.)[7]

---

[7]Again and again the witness used similar language in describing Edison's understanding of the intent of the fuel clause. Thus he replied as follows to cross-examination by a deputy city attorney of the City of San Diego:

"Q. Now, the purpose as I understand it, of the fuel clause adjustment is to insure that the difference between revenues and expenses come[s] out even; isn't that true? A. I don't

This distortion of the purpose of the fuel clause permeates Edison's treatment of its overcollections of rates which began to accumulate shortly after the clause was put into effect.[8] Edison invoked the clause at every opportunity between May 1972 and December 1974, and in so doing raised its rates no less than 12 times. By the end of 1974, the cumulative total of costs charged to Edison's customers by operation of the fuel clause alone reached approximately $408 million.[9] During the same period, however, Edison's actual fossil fuel needs turned out to be far lower than predicted. The primary reason was unusually heavy precipitation during the 1972-1973 and 1973-1974 seasons. The phenomenon caused a substantial increase in the availability of hydroelectric power, which is a much cheaper source of energy than fossil fuels.[10] As a result, Edison spent considerably less for fossil fuels—and in particular for oil—than it had estimated in computing its adjustments under the fuel clause. Indeed, by the end of 1974 Edison had spent only $262.2 million of the $408 million billed for fuel expenses, leaving the company holding $145.8 million more than it needed to offset increased fuel costs. (Auditor General's Rep. p. 4.)

Not surprisingly, at the hearings below Edison's witness was extremely reluctant to admit that the company in fact treated such overcollections

---

think I could characterize it that way.

"Q. Would you characterize it? A. I think as I've characterized earlier in my testimony and my cross-examination, the fuel clause was a device that was put into Edison's tariff schedules to help minimize or to *offset any decay in the rate of return* that would otherwise occur due to changes in the fuel and purchased power pricing mix that were being experienced by the company." (Italics added.)

[8]Edison's misconception also underlies its contention that it is entitled to keep these overcollections because during the years in question its actual rate of return averaged less than the minimum reasonable rate previously authorized by the commission. The contention fails for two reasons. First, as noted above, Edison was not entitled to earn a profit on its expenses. Second, even its lawful profit was not guaranteed. A utility is entitled only to the *opportunity* to earn a reasonable return on its investment; the law does not insure that it will in fact earn the particular rate of return authorized by the commission, or indeed that it will earn any net revenues. (*Power Comm'n* v. *Pipeline Co.* (1942) 315 U.S. 575, 590 [86 L.Ed. 1037, 1051-1052, 62 S.Ct. 736]; *Bluefield Co.* v. *Pub. Serv. Comm'n* (1923) 262 U.S. 679, 692-693 [67 L.Ed. 1176, 1182-1183, 43 S.Ct. 675]; *Re Gen. Tel. Co. of Cal.* (1969) 69 Cal.P.U.C. 601, 610; *Oakland* v. *Key System Transit Lines* (1953) 52 Cal.P.U.C. 779, 786.)

[9]Office of the Auditor General, Report on Adjustment of Electric Rates for Fuel Cost Changes (Aug. 1975) at page 4 (hereinafter called Auditor General's Rep.).

[10]A secondary reason was above-average temperatures during the same seasons, causing a substantial decrease in the demand for natural gas for heating purposes and a concomitant increase in its availability for generating electricity. Natural gas is a cheaper fuel than oil.

as earnings; rather, he took refuge in the repeated assertion that the funds could not be "isolated" from Edison's overall revenues.[11] It clearly appears from published figures, however, that Edison's overcollections pursuant to the fuel clause were not only large in the absolute sense, they amounted to a very significant proportion of the company's general revenue picture. For example, for the year 1974 Edison reported a total net income from all sources of $218.3 million;[12] yet during the same 12-month period, according to Edison's own figures filed with the commission in compliance with the decision under review, Edison's net fuel clause overcollections were $122.5 million—in other words, they constituted more than 56 percent of the company's systemwide net income for the entire year. Moreover, that net income was itself 47.8 percent higher than in the previous year, even though sales were lower; Edison's reported earnings per share were $4.10 for 1974, as compared with $2.70 for 1973; and the company's board of directors voted to increase the common stock dividend in 1974, the first such raise in three years. (Annual Rep., p. 4.) In announcing all these benefits to the shareholders, Edison acknowledged that the fuel clause adjustments, together with a general rate increase in late 1973, "contributed substantially to higher revenues." (*Ibid.*)

These continuing overcollections by Edison and other electric utility companies did not pass unnoticed. On the contrary, they triggered a sequence of public complaints, investigations, and proposals for reform or abolition of the entire fuel clause procedure. Among the most vocal critics were consumer groups (e.g., *The Fuel-Adjustment Caper* (Nov. 1974) 39 Consumer Rep. 836) and organs of the Congress (see Rep. of Subcom. on Oversight and Investigations of House Com. on Interstate and Foreign Commerce on Electric Utility Automatic Fuel Adjustment Clauses (Oct. 1975) *passim*).[13] The same overcollections were the primary

---

[11]This position drew the following reaction from the commission examiner: "if we isolate the fuel cost revenues in a separate [adjustment] proceeding, why would you not isolate the revenue that you received thereafter? You want to obtain the revenues in an isolated fashion to avoid the regulatory lag but you do not want to account for those revenues in an isolated fashion. I think that is totally inconsistent."

[12]Southern California Edison Company, Annual Report to Shareholders (1974) page 12 (hereinafter called Annual Rep.).

[13]In the latter report, introduced as an exhibit in the proceedings before the commission, the congressional subcommittee declared it was "dismayed by the frequency in which fuel clauses have enabled utilities to bill consumers for fuel costs that were never incurred." (*Id.* at p. 6.) The report then singled out Edison as having "boasted of its profit-making fuel clause," and rejected Edison's rationale that "it is proper for a

incentive for the commission's order instituting the present investigation into the use and abuse of the fuel clause in California.[14]

While sharing many of the concerns voiced by critics of the clause, the commission determined that the cost adjustment concept should be preserved but the clause should be modified to eliminate the defects revealed by experience. The principal such defect, as we have seen, was the provision authorizing Edison to base its calculations on a prediction of its fossil fuel needs for the 12-month period following each application for a billing adjustment, premised on the assumption that "average" weather conditions would prevail throughout that time. The commission abandoned this procedure, and in lieu thereof adopted a clause which operates on a "recorded data" basis, i.e., on the *actual* fuel expenses incurred by the utility during the period *preceding* its application for a billing adjustment.[15] The utility is now required to maintain a monthly "balancing account," into which it will enter the amount by which its actual energy cost for the month was greater or less than the revenue generated by the clause; and on each occasion hereafter that the clause is invoked, the billing factor will be adjusted so as to bring the balance of this account back to zero. By this device the possibility of large over- or undercollections accumulating in the future is eliminated. And because the commission expanded the clause to include all sources of purchased energy—e.g., nuclear and geothermal, in addition to fossil fuels—it renamed the device the "energy cost adjustment clause."[16]

---

utility to overcollect through the operation of its fuel clause, provided the company's overall earnings do not exceed its authorized rate of return. Such a view would seem to contradict the industry's oft repeated assurances concerning the neutral effects of fuel clauses." (*Id.* at p. 7.) For these and other reasons the subcommittee found that "fuel adjustment clauses, in any form, are unwise, unnecessary, unworkable, and unfair" (*id.* at p. 1), and concluded that such clauses "should be abolished except during limited emergency periods. Even in such situations, all fuel adjustment clause charges should be subject to a prompt commission audit and refund with interest." (*Id.* at p. 3.)

[14]The investigation inquired into the fuel cost collection practices of Pacific Gas and Electric Company (PG&E), San Diego Gas and Electric Company (San Diego), and Sierra Pacific Power Company (Sierra Pacific), in addition to Edison. The resulting decision of the commission affects all four utilities, but only Edison has sought judicial review.

[15]A clause so designed, of course, eliminates all reliance on forecasts of weather conditions 12 months in advance, which the commission found to be both "inaccurate and unreliable" in the present state of the art.

[16]There is nothing novel about a fuel or energy clause which operates on actual recorded data. PG&E proposed such a provision in the proceedings originally leading to its own fuel clause. (*Re Pacific Gas & Electric Co.* (1973) 74 Cal.P.U.C. 781, 786.) The fuel clause of Sierra Pacific has been based on recorded data since its inception four

There remained, however, the massive overcollections accumulated by Edison, PG&E, and San Diego under the old fuel clause.[17] Treating these funds in essentially the same way as the monthly over- or undercollections to be adjusted under the new energy clause, the commission directed each utility to calculate a "fuel collection balance," i.e., the amount by which its actual fossil fuel cost incurred since its fuel clause took effect was greater or less than the revenue generated by the clause. But rather than subjecting the utilities to the financial hardship of reducing that balance to zero in a single stroke, the commission adopted a proposal urged by PG&E of allowing the companies to gradually amortize the sum by monthly billing credits spread over a period of three years.[18] That time span, the commission found, "is a fair and reasonable initial time period over which to amortize such difference, without unduly burdening either the utility or the ratepayer . . . ." (79 Cal.P.U.C. 758, 773.)

Seen thus in its full perspective, the transitional procedure adopted by the commission to deal with these overcollections is surely "fair and reasonable." It is not significantly different from the operation of the "billing account" under the new energy clause, and Edison expressly disavows any challenge to the latter device. For both analytical and legal reasons, it does not constitute retroactive ratemaking.

First, Edison has known from the very beginning that in our state favorable weather conditions inevitably alternate with unfavorable conditions, and hence that any overcollections the company might accumulate via the fuel clause would inexorably be followed by corresponding undercollections which would reduce its fuel collection balance to zero. Numerous witnesses before the commission recognized the existence of such weather cycles in California and their resulting

years ago. (*Re Sierra Pacific Power Co.* (May 8, 1973) Dec. No. 81355.) And on a nationwide scale, fuel clauses in all tariffs under the jurisdiction of the Federal Power Commission now operate on recorded data (18 C.F.R. § 35.14 (1975)), as do the majority of such clauses authorized by state regulatory agencies (see Trigg, *Escalator Clauses in Public Utility Rate Schedules* (1958) 106 U.Pa.L.Rev. 964, 976-979).

[17]According to Edison's figures filed with the commission in compliance with the decision under review, Edison's net fuel clause overcollections amounted to $133,241,000, as of April 30, 1976. The total fuel collection balance for all three major utilities exceeded $200 million. Sierra Pacific experienced a small undercollection in the operation of its fuel clause.

[18]PG&E's expert witness characterized this as "the conversion factor, which would be a downward adjustment in the fuel cost adjustment that would otherwise be in effect."

balancing effect on costs and revenues under the fuel clause. Thus William M. Gallavan, PG&E vice president for rates and valuation, explained "there are cyclical changes in the weather conditions, and that is the basis for setting rates heretofore in California." With respect to variations in precipitation, for example, he noted that it requires an extended period of time "in order to complete the cyclical impact of the hydroelectric generation." John E. Johnson, supervising utilities engineer for the commission, went into further detail. He stated that because of these weather cycles, over- and undercollections pursuant to the fuel clause will balance out "given enough time." When asked if 30 or 40 years might be required for this purpose, he replied in the negative; based on his experience, it was unlikely in his opinion "that it would take as much as 10 years for the self-contained balancing process to work itself out with the present clause." The witness subsequently explained that over an appropriate time span the probabilities of favorable and unfavorable nonaverage weather conditions are "about equal," and that it is inherent in the concept of average-year ratemaking in California that "over a long haul the company or the utility *is made whole solely by reason of changing weather circumstances.*"

This view is supported not only by the record but by Edison itself. In its petition to this court Edison recognizes that the commission has traditionally made "the valid historical assumption" that "over a period of years variations from historical average weather conditions will balance out." And the same petition argues that if the weather cycle were allowed to run its course the present overcollections would likewise be balanced out: abnormally wet and warm conditions created this "temporary differential," Edison asserts, "and it is only the Commission's own decision to shift from an average-year forecast method to a recorded method that will prevent *the averaging out of the effect of weather conditions on the revenue-expense differential in the long run.*" (Italics added.)

It follows from Edison's own words that if the commission had allowed the current weather cycle to run its course, all overcollections would have been absorbed during nonaverage dry and cool years by Edison's greater fuel expenses, and the company's total dollar benefit from operation of its fuel clause would ultimately have been nil. The point was succinctly made by a dissenting commissioner in the proceedings below: although deeming the 36-month billing credit order to be retroactive ratemaking, that opinion concluded: "It does not follow from

.the above that we are powerless to prevent Edison from reaping a windfall. One way open is simply to maintain the average year forecast fca [fuel cost adjustment] until a complete weather cycle has occurred. In this way, the above-average wet years will be offset by below-average wet years in time." (— Cal.P.U.C. —, — (Dec. No. 86085, p. 4) (dis. opn. by Comr. Sturgeon).)

What the commission has done by adopting the present fuel collection balance procedure is simply to choose "another way" of preventing Edison from reaping the same windfall—a way which substitutes a definite credit period of three years in lieu of awaiting the natural completion of the current weather cycle, an event of uncertain date but statistically inevitable occurrence. Inasmuch as the two methods achieve the identical result—a final balancing of fuel clause over- and undercollections—and Edison itself embraces the former, the commission rightly concluded that it has not subjected Edison to retroactive ratemaking by choosing the latter because of a perceived need to institute the new energy clause without delay. Indeed, in view of the same weather cycle Edison cannot fairly complain that it has suffered the disruptive financial consequences of true retroactive ratemaking as exemplified by *Pacific Tel. & Tel.* and *City of Los Angeles I*: in the long run Edison admittedly had no expectation of retaining its present fuel clause surplus, and even in the short run it could not reasonably have relied on the use of that surplus because it must have known that in California drought can occur at any time.

Secondly, we do not write on a clean slate in this case. That the foregoing procedure does not constitute retroactive ratemaking within the meaning of *Pacific Tel. & Tel.* and *City of Los Angeles I* is demonstrated by our decision in *City of Los Angeles v. Public Utilities Com.* (1975) 15 Cal.3d 680 [125 Cal.Rptr. 779, 542 P.2d 1371] (hereinafter *City of Los Angeles II*). For present purposes we need not repeat in detail the complicated history of that litigation. (See *id.* at pp. 684-690; *City of Los Angeles I, supra,* 7 Cal.3d at pp. 336-340; *City and County of San Francisco v. Public Utilities Com.* (1971) *supra,* 6 Cal.3d 119 (hereinafter *City & County of San Francisco*).) It will be sufficient to recall the operative facts and our rulings insofar as here relevant.

Briefly, when a regulated utility switches from the "straight-line" to an "accelerated" method of depreciation for federal tax purposes, an

immediate tax saving results. Under the procedure called "accelerated depreciation with flow-through," that saving is passed on to the ratepayers: the utility pays its taxes on the basis of accelerated depreciation, and the rates are lowered because no more than the actual tax expense incurred is recovered from the ratepayers as a cost of service. Under the procedure called "accelerated depreciation with normalization," however, the tax saving is retained by the utility: the company still pays its taxes on the basis of accelerated depreciation, but the commission computes the taxes which would have been imposed if the straightline method had been used and permits the utility to recover that higher amount in the rates. The difference between the latter amount and the actual tax expense is set up on the utility's books as a reserve account for "deferred taxes." (*City of Los Angeles I, supra,* 7 Cal.3d at pp. 338-339 & fn. 3.) In practice, however, such taxes never materialize: because the utility's level of investment in a new plant typically equals or exceeds plant retirement, new depreciation deductions are continuously generated and the tax "deferral" in effect becomes permanent. In such circumstances not only are the ratepayers charged for tax expenses which the utility will never have to pay, but the balance in the reserve account is thus transformed into a capital asset of the utility upon which it can earn interest or, if invested in plant, a return from the ratepayers. (*City of Los Angeles II, supra,* 15 Cal.3d at pp. 686-687, 690 & fn. 18.)

Prior to 1969 all utilities except Pacific Telephone and Telegraph Company and General Telephone Company of California used accelerated depreciation with flow-through; the latter two continued to use straight-line depreciation. In 1969 the federal tax law was amended to provide that utilities which had not theretofore adopted accelerated depreciation could do so thereafter only with normalization. The two telephone utilities subsequently switched to accelerated depreciation with normalization, and began accumulating the "reserves" described above. In *City & County of San Francisco* we annulled a commission decision which failed to consider possible ways of preventing the telephone utilities from keeping this windfall. "By permitting Pacific to include in its costs a charge for federal taxes greatly in excess of its actual federal tax expense," we reasoned, the commission in effect forced the ratepayers to contribute capital to the telephone system—a result wholly at odds with basic principles of ratemaking. (6 Cal.3d at p. 129.) Accordingly, we directed the commission to examine afresh all lawful alternatives for dealing with these "reserves." (*Id.* at pp. 130-131.)

828

Among the alternatives was a procedure which the commission thereafter ruled it had no legal authority to adopt: the annual adjustment clause. In *City of Los Angeles II* we addressed that question, and unanimously held the commission had the power to employ such a remedy. We began by explaining the operation of the adjustment clause: "the rate established by the commission includes a formula which, when applied each year to figures in the utilities' accounts, produces appropriate adjustments in rates, to keep them in step with the company's changing financial situation. In the case of annual adjustment to reflect the growing deferred tax reserves, the *actual* amount of the reserve accumulated by the utility would be compared with the amount used in the test year on the basis of which the commission set rates. As the reserve grew, the formula would effect a corresponding reduction in the rate base to take account of this new source of investment capital." (Fns. omitted.) (15 Cal.3d at p. 691.)

We then emphasized the difference between a true ratemaking proceeding, in which many variables are taken into account and broad policies are formulated, and the narrowly restricted and semi-automatic functioning of an adjustment clause: "The effect of annual adjustment in some respects resembles that which would occur if the commission each year conducted a new rate proceeding in which all factors except that of tax reserve held constant. In such a case the commission would look to the tax reserve as the sole relevant variable and reduce the rate base to compensate for tax reserve accumulations. As long as the commission's policy towards the tax reserve accumulations remained unchanged, however, *such yearly proceedings would reduce themselves to substantially ministerial steps.*" (Italics added; fn. omitted.) (*Id.* at pp. 691-692.) In a footnote at this point (fn. 25) we identified the steps in question: "the regulatory commission's primary function should be to gather empirical data periodically on changes in each utility's tax reserve accumulations and then apply relevant data to the adjustment formula."

The relevance of *City of Los Angeles II* to the issue at hand is not a matter of speculation: throughout the opinion in that case we relied expressly on the analogy between a tax expense adjustment clause and a fuel cost adjustment clause. For example, after the foregoing explanation of the essentially "ministerial" operation of tax adjustment clauses, we continued: "In similar circumstances the commission has concluded that the promulgation and periodic application of an adjustment formula

more efficiently implements its policy. [¶] The commission thus employs adjustment clauses when it encounters an item of expense or revenue which tends to vary abnormally in comparison to the utility's other financial data; fuel cost adjustment clauses, which the commission presently inserts in the tariffs of power companies, constitute a prominent current use of such clauses. The commission's staff experts testified that the rapidly accumulating tax reserves presented an anomalous factor in the telephone companies' financial profile similar to that posed by the fuel costs of the power companies." (Fn. omitted; *id.* at p. 692.)

The commission nevertheless refused to consider adopting a tax adjustment clause because it believed that Public Utilities Code section 728 (fn. 2, *ante*) compels a full hearing before each application of an adjustment formula. Section 728, of course, is the statutory foundation for the hearing requirement in true ratemaking proceedings. We held that no such hearing is necessary each time the commission modifies the existing rate base by operation of an adjustment clause. After referring again to the commission's longstanding use of fuel clauses, we concluded: "the purpose behind the hearing requirement of section 728 demonstrates the permissibility of the annual adjustment scheme here at issue. The purpose of the hearing is to air the policy considerations behind various rate proposals and to establish controverted facts; as the commission's experience with fuel clauses has shown, a hearing serves no purpose when the only business at hand is the application of a mathematical formula to a figure definitively established by reference to the utilities' books. The legislative purpose behind section 728 is better served by a plenary consideration of the advantages and disadvantages of an annual adjustment clause [i.e., at the time that clause is adopted in a true ratemaking proceeding] than by a yearly charade attendant to its application." (*Id.* at p. 697.)[19]

Thus although section 728 requires a hearing in every true ratemaking proceeding, *City of Los Angeles II* teaches that a hearing is not required each time the rate base is changed by application of an adjustment clause; it follows that in ordering such adjustments the commission is not engaged in ratemaking. The reasoning applies equally to the decision

---

[19]For similar reasons we went on to hold that although a prior opportunity to be heard is also required by the due process clause in a true ratemaking proceeding, the Constitution does not compel such an unnecessary step before each subsequent application of an adjustment formula adopted in that proceeding. (*Id.* at pp. 697-703.)

under review,[20] and it leads to the conclusion that in authorizing Edison every few months to adjust its rates by operation of the fuel clause the commission was not engaging in ratemaking. Because the increased charges thus imposed were not the products of ratemaking, they were not rendered inviolable by the rule against *retroactive* ratemaking. To put it another way, the commission's decision to further adjust those rates so as to compensate for substantial past overcollections may well be retroactive in effect, but it is not retroactive *ratemaking*.[21]

An additional proof of this fact appears in the dispositive portions of our decision in *City of Los Angeles II.* We there proposed alternative methods by which the telephone utilities could be prevented from benefiting from the collection of rates which, although lawful, were higher than necessary because they had made provision for tax expenses that did not materialize. Among those alternatives, we advised the commission that it could compensate for such past overcollections by the device of reducing the utilities' rates of return in the future: "the commission could choose to mitigate the 'windfall' accruing to [the utilities] in consequence of their failure to elect accelerated depreciation prior to 1969, *by setting more modest rates of return* in recognition of the additional source of capital available to the utilities by virtue of the federal tax laws." (Italics added.) (15 Cal.3d at pp. 704-705, fn. 42.)[22]

Again the reasoning is applicable here,[23] and it fully supports the commission's decision to likewise "mitigate the windfall" in the case at

---

[20]It is true that *City of Los Angeles II* authorized the use of a clause designed to adjust the *rate base* (*id.* at p. 691) to reflect the utilities' changing financial situation, while the fuel clause in the case at bar operated by means of a billing factor which had the effect of adjusting the *rates.* But the distinction is without practical effect: because one element of the rates is a return on the rate base, a sufficient change in the latter will produce a corresponding change in the former. The same result can thus be achieved by appropriate adjustments to either.

[21]Thus the commission was correct in formally finding that the rates fixed by operation of the fuel cost adjustment clause were not "general rates" but "extraordinary rates not created by or in a general rate proceeding"; and it was equally correct in concluding therefrom that "The future reduction of fuel clause adjustment rates is not retroactive ratemaking," even though designed "to reflect past over- or undercollections." (79 Cal.P.U.C. 758, 772, 773.)

[22]That this was not an ill-considered dictum is shown by the fact that we reiterated the proposal in our judgment. (*Id.* at p. 708.)

[23]Because of the interdependence of rate base, rate of return, and rates (see fn. 20, *ante*), there is no essential difference between offsetting past overcollections by adjusting future rates, as the commission did in the case at bar, and reaching the same result by adjusting future rates of return, as we said it could do in *City of Los Angeles II.*

bar by adjusting Edison's rates in the future so as to offset its past overcollections for fuel expenses which did not materialize. Surely our unanimous opinion in *City of Los Angeles II* would not have advised the adoption of an illegal procedure; and the conclusion is inescapable that if our proposal therein did not constitute retroactive ratemaking, neither does the commission's action here.

The decision is affirmed.

Wright, J.,* Elkington, J.,† and Sims, J.,‡ concurred.

**CLARK, J.**—I dissent.

Until today it was settled by statute and case law in California that "ratemaking" could not be retroactive. The Public Utilities Commission order patently constitutes retroactive ratemaking because it provides credits for the difference between lawfully fixed, final rates and those rates which in the commission's present view should have been collected.

The commission attempts to avoid the rule against retroactive ratemaking by claiming there is no retroactivity. However, the measure of the credit remains asserted *past* "overcollections," and, as the majority recognize, the credit is retroactive in effect. (*Ante,* p. 830.)

Rejecting the commission's attempted distinction, the majority attempt to avoid the rule against retroactive ratemaking on the theory that adjusting rates does not involve ratemaking. (*Id.*) Not only is the majority's basic premise fallacious, but their holding that adjustments are exempt from the rule against retroactive ratemaking effectively abrogates the rule, establishes a new system which can be manifestly

---

*Retired Chief Justice of California sitting under assignment by the Acting Chairperson of the Judicial Council.

†Assigned by the Chairperson of the Judicial Council.

‡Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

unfair, and creates uncertainties which can only result in downgrading all California utility bonds, potentially costing our citizens billions of dollars.

Attempting to establish a need for retroactive ratemaking, the majority speculate that Edison received excessive profits during the periods involved here. The speculation is false and unwarranted. Edison's return for the period is before us as part of the record. But the majority chooses to ignore the record which shows Edison did not receive excess profits. To the contrary, Edison's rate of return fell below 8.2 percent approved by the commission. When those results are adjusted for the credits ordered, it is apparent that Edison's rate of return will be closer to 4 percent than to 8.

## I. The Commission's Actions

On 18 March 1975 the Public Utilities Commission began to review the electric fuel cost adjustment of the major electric generating corporations. The commission concluded in Decision No. 85731 to abandon the existing method of computing the fuel cost adjustment and to substitute a new method, the energy adjustment clause. The commission also directed that future rates of the corporations be adjusted over a 36-month period, increasing or decreasing the rates by the difference between revenues collected pursuant to the old fuel cost adjustment and actual fuel costs.

In this review proceeding, Edison does not object to switching from the fuel cost adjustment to the energy adjustment clause; rather, it challenges the commission's order directing rate adjustment on the basis of past revenues and costs, approximating $177 million as of 31 August 1975.

The commission's general approach in rate proceedings is "to determine with respect to a 'test period' (1) the rate base of the utility, i.e., value of the property devoted to public use, (2) gross operating revenues, and (3) costs and expenses allowed for rate-making purposes, resulting in (4) net revenues produced, sometimes termed 'results of operations.' Then, by determining the fair and reasonable rate of return to be fixed or allowed the utility upon its rate base, and comparing the net revenue which would be achieved at that rate with the net revenue of the test period, the commission determines whether and how much the utility's

rates and charges should be raised or lowered. . . . The test period is chosen with the objective that it present as nearly as possible the operating conditions of the utility which are known or expected to obtain during the future months or years for which the commission proposes to fix rates. The test-period results are 'adjusted' to allow for the effect of various known or reasonably anticipated changes in gross revenues, expenses or other conditions, which did not obtain throughout the test period but which are reasonably expected to prevail during the future period for which rates are to be fixed, so that the test-period results of operations as determined by the commission will be as nearly representative of future conditions as possible." (*Pacific Tel. & Tel. Co.* v. *Public Util. Com.* (1965) 62 Cal.2d 634, 644-645 [44 Cal.Rptr. 1, 401 P.2d 353]; *City of Los Angeles* v. *Public Utilities Com.* (1972) 7 Cal.3d 331, 336 [102 Cal.Rptr. 313, 497 P.2d 785].)

Among the costs to be recovered by electric utilities are their fuel costs for hydroelectric power, nuclear fuel, and for fossil fuels such as coal, gas, and oil. When Edison's rates were fixed in 1971, fuel requirements were estimated on the basis of historical average conditions of precipitation and temperature, a method used for many years. Fossil fuel prices were based on historical prices.

Recognizing that fossil fuel prices were increasing rapidly and that an expedited method of rate adjustment was required, the commission in 1972 approved a fuel cost adjustment allowing rate adjustments for fossil cost changes without a full rate hearing. The commission pointed out that the expedited proceeding would lessen the frequency of general rate cases and enhance the utility's position in the financial community. Application for adjustment could be made every three months.

To determine the appropriate adjustment under the fuel clause, Edison first estimated total energy requirements based on a 12-month forecast using average weather conditions. Edison then deducted the portion of the energy requirements to be met by nonfossil fuels. The remainder was the estimated fossil fuel requirement. By estimating current costs of gas, coal and oil and comparing costs of those fuels reflected in the base rates, Edison would fix the increase or decrease in revenue needed during the forecast period.

In years of above average precipitation, more hydroelectric power is generated than is contemplated by the original rates and by the

adjustment since they are based on average year weather conditions. There is a large difference in cost between hydroelectric power and fuel oil, and in wet years the fuel clause will produce revenue in excess of expense actually incurred. The reverse will be true in dry years. Over an extended period it is not unreasonable to expect excess revenue in wet years to roughly balance against the revenue shortage of dry years. However, because long range weather conditions remain unpredictable, there may be no balance, and over a shorter period, the likelihood is that revenues and expenses will not balance.

In its review the commission found that all filings by the utilities complied with the latter's fuel clause adjustments, the rates were just and reasonable, and all funds collected as a result of the adjusted tariffs were lawfully collected. Nevertheless, because of above average precipitation and because more natural gas was available than had been anticipated, the fuel adjustment resulted in an increase in actual revenues substantially exceeding any increase in fuel costs actually incurred.

Due to lack of correlation between actual revenues and actual costs under the old fuel adjustment, the commission decided to abandon it, switching to a new fuel adjustment based on actual or recorded costs. The commission also directed Edison to compute the amount of revenue collected and the increased fuel cost experienced under its fuel adjustment clause in the past and to credit against future charges for the next 36 months the amount by which the past revenues exceeded costs.[1]

Edison claims that the credit requirement is unlawful retroactive ratemaking and that, even if not, the credit requirement was improper because the basic rates plus the adjustment failed to produce the rates of return allowed by general rate proceedings.

## II. The Rule Against Retroactive Ratemaking

Public Utilities Code section 728 provides: "Whenever the commission, after a hearing, finds that the rates . . . demanded, observed, charged, or collected by any public utility for or in connection with any service . . . are . . . unreasonable . . . the commission shall determine and

---

[1]The amounts to be credited are characterized by the commission as "overcollections." Edison challenges the characterization on the ground the funds were collected pursuant to final rates lawfully fixed by the commission. The label placed on the amounts to be credited is not determinative. Rather, we must look to the basis of the credit.

fix, by order, the just, reasonable, or sufficient rates . . . to be thereafter observed and in force. . . ."

Section 734 provides: ". . . No order for the payment of reparation upon the ground of unreasonableness shall be made by the commission in any instance wherein the rate in question has, by formal finding, been declared by the commission to be reasonable . . . ."

In *Pacific Tel. & Tel. Co.* v. *Public Util. Com., supra,* 62 Cal.2d 634, 649-656, this court held the Legislature intended that rates be fixed prospectively only. In that case, the commission initiated an investigation of the utility rates, found the rates to be unreasonably high, established new lower rates, and ordered the utility to refund amounts collected in excess of the new rates during the period between the initiation of investigation and its order reducing rates.

Invalidating the refund order, this court reasoned that rate changes are legislative in character and prospective in application, that the language of section 728 is plain and unambiguous in requiring rates to be fixed prospectively, and that numerous courts in other jurisdictions have interpreted similar language as prohibiting retroactive rate reduction. It was also pointed out that Public Utilities Code section 734 prohibits reparations on the ground of unreasonableness of a rate where the commission formally found the rate to be reasonable and the charges had been collected accordingly. The court stated that policy arguments asserted in favor of granting the commission retroactive ratemaking authority should be addressed to the Legislature.

This court adhered to the rule against retroactive ratemaking in *City of Los Angeles* v. *Public Utilities Commission* (1972) 7 Cal.3d 331, 338, 355-359 [102 Cal.Rptr. 313, 497 P.2d 785]. There the commission granted a substantial rate increase to the utility, and on petition for writ of review, we granted a stay permitting collection of the increased rates subject to refund.

When this court annulled the rate increase and remanded the case for further proceedings, it was held that the entire increase must be refunded—the new rates being annulled, the old rates remaining in effect. We expressly rejected a claim by the utility that the refund should be limited to the difference between the rates collected and the rates to be set in further proceedings. It was not disputed that the preexisting

rates—reestablished by annulment of the new rates—may have been unreasonable as of the date of the commission's invalid order setting new rates. Rather, assuming the evidence might warrant a finding of unreasonableness, the court stated: "To permit the commission to redetermine whether the preexisting rates were unreasonable as of the date of its order and to establish new rates for the purpose of refunds would mean that the commission is establishing rates retroactively rather than prospectively." (7 Cal.3d at p. 357.)

It was noted substantial policy reasons exist both for and against permitting retroactive ratemaking and that it was for the Legislature to determine whether California should repeal its policy against retroactive ratemaking. (7 Cal.3d at p. 357.)

The rule against retroactive ratemaking places upon the utility the risk that in fixing the rate the commission erred in estimating expenses and revenues. If the estimated revenues were too high or the estimated costs too low, the utility will bear the loss and fail to recover the projected rate of return. On the other hand, if the estimated revenues are lower than those that actually occur or the estimated costs higher than actual costs, the utility will benefit. Because so many circumstances exist significantly affecting expense and revenue, it is to be anticipated that estimated costs and revenues will rarely, if ever, equal actual ones and that the utility will realize more or less than the predicted rate of return.

The rule against retroactive ratemaking serves to encourage efficiency because the utility will strive to hold down costs so as to increase profits under the established rate.[2] Permitting retroactive ratemaking would shift the risk of error in estimating costs and revenues from the utility to the consumer, reducing the utilities' incentive for efficiency.

The above cases establish that once a lawfully adopted rate is fixed a subsequent finding that it is either unreasonably high or low does not justify either refunding excess revenues collected pursuant to the rate or retaining revenues collected pursuant to an invalid rate increase. To either refund or retain on the basis of what would have been a reasonable rate constitutes retroactive ratemaking.

---

[2]The utility will be the immediate beneficiary of cost savings due to increased efficiency. However, when rates are adjusted, the adjustments will be based on historical costs, including savings due to increased efficiency. In this manner the ratepayer will ultimately benefit from increases in efficiency.

The use of the credit system in the instant case likewise involves retroactive ratemaking. The credit is substantially equivalent to the refund. The basis of credit calculation is not estimated costs, revenues and rate of return for future activities but rather revenues collected in prior years and the revenues which in retrospect would have constituted a reasonable rate during past periods. There is no substantial difference—from the standpoint of ratepayer or utility—between repayment by way of credit against future billings of the assertedly excess amount collected and repayment by way of refund, the practice condemned in *Pacific Tel. & Tel. Co.* v. *Public Util. Com., supra,* 62 Cal.2d 634, 649-656. The commission is establishing a new rate for a past period and in effect requiring refunds for amounts collected in excess of the new rates, the practice condemned in *City of Los Angeles* v. *Public Utilities Commission, supra,* 7 Cal.3d 331, 357.

### III. The Commission's Reasoning

Although the commission in the instant case found the old rates reasonable rather than unreasonable, this can furnish no lawful basis for the credit. It would be anomalous to permit the commission to require credits on the basis of reasonable rates while denying it power to grant credit for unreasonable ones.

The commission claims that the credit requirement is not retroactive ratemaking but merely an "adjustment of future" rates based on an incomplete weather cycle. The commission points out that the original adjustment was based on average year weather conditions, and that over the years above average precipitation resulted in revenues exceeding costs. The commission asserts the credit system merely compensates for the balance of the weather cycle—because below average precipitation years may be expected in the future. However, future weather conditions are as unpredictable today as in 1972, 1973, 1974, and 1975. There is nothing in the record to show that three or four wet years will be followed by dry years, that there is a predictable weather cycle, or that Edison, should the average year calculation be continued, would have its so-called "overcollections" balanced by "undercollections" in the future. Moreover, even if a basis exists for concluding there is a predictable weather cycle, nothing indicates that it commenced in 1971 or did not end in 1975. So far as appears, the preceding four years when Edison was charging on the average precipitation basis may have been dry ones, yet

no adjustment is made. Similarly, the next 10 years are as likely to be wetter than average as drier than average.[3]

The possibility that a new or different method of accounting practice for ratefixing might be more favorable to a utility, or fairer than an old method, does not warrant reducing rates for the future below those called for by the new method. As mentioned at the outset of this opinion, the basic system of ratemaking is to estimate the rate base, to fix a reasonable rate of return upon the estimated rate base, to estimate the costs of the utility, and to set the rates to provide revenues to cover the estimated return and costs. Adjustments to the estimated rate base or estimated costs used in fixing the rate will not be allowed unless justified by a showing that extraordinary rate base changes or cost or revenue changes may be reasonably anticipated to occur without compensating factors. (*City of Los Angeles* v. *Public Utilities Commission, supra,* 7 Cal.3d 331, 345-348, 351.) The credit provision does not reflect an estimated cost to be incurred, a factor to be included in estimated rate base, or an estimated revenue to be received, and thus the change in accounting practices does not justify the credit.

The reliance on weather cycles is a subterfuge—the basis of the credit provision is its measure, the difference between revenues received under the fuel adjustment and the actual costs of the fuel in past years. Requiring return of profits earned under prior lawful rates is the essence of retroactive ratemaking.

The commission attempts to rely upon language in *City and County of San Francisco* v. *Public Utilities Com.* (1971) 6 Cal.3d 119 [98 Cal.Rptr. 286, 490 P.2d 798] to the effect that it has the power to prevent utilities from resorting to accounting practices resulting in unreasonably inflated expense figures and may disallow expenditures reflecting unreasonable costs for materials. However, that case was concerned with the calculation of future costs for the purpose of fixing future rates—not for

---

[3]While California experienced drought in 1976 and 1977, the drought mainly affected the northern and central parts of the state rather than the southern part—Edison's main area of operation. The water storage levels on the south coast were average and Colorado River storage above average as of 1 October 1976. While as of 1 May 1977 the south coast had dropped to 75 percent of average, Colorado River storage was at 130 percent of average on that date. (Water Conditions in California, Dept. Water Resources Bull. No. 120-77, Rep. No. 4 (1 May, 1977) p. 5;. The California Drought—1977: An Update, Dept. Water Resources (15 Feb., 1977) p. 5.)

calculating past lawful profits for the purpose of refunds or credits against future rates. (6 Cal.3d at pp. 126-129.)

## IV. THE MAJORITY HOLDING

The majority hold that adjustments of rates do not constitute ratemaking. This reflects a misunderstanding of the justification, procedure and result of an adjustment.

As pointed out above, rates are fixed on the basis of revenues, costs, the rate base, and the reasonable rate of return to be allowed the utility. Although a test year's figures are initially used, those figures may be adjusted to reflect reasonably anticipated changes to occur in the future. (*Pacific Tel. & Tel. Co.* v. *Public Util. Com., supra,* 62 Cal.2d 634, 644-645.) If the adjustments are to be made, they must be made throughout the equation—it is improper to adjust the expense side or rate base without also adjusting the revenue side, unless the expense or rate base adjustment is extraordinary in comparison to past practice. (*City of Los Angeles* v. *Public Utilities Commission, supra,* 7 Cal.3d 331, 345-348.)

In a growing state like ours it is obvious that revenues, expenses, and rate base will not remain constant but will increase. Whether test year results are adjusted for anticipated changes or not, the entire system of ratemaking is based on estimates of what the future will hold, and it is obvious that the estimates will rarely, if ever, be exactly realized. The basic assumption underlying the fixing of the rates on the basis of historical data is that for future years changes in revenues, expenses, and rate base will vary proportionally so that the utility will receive its authorized rate of return. (*City of Los Angeles* v. *Public Utilities Com.* (1975) 15 Cal.3d 680, 692 [125 Cal.Rptr. 779, 542 P.2d 1371].) The utility is required to record the results of its operations, and should it appear that the relationship is not being maintained, the utility or the commission staff may institute proceedings for new rates.

Rather than require a full rate proceeding each time that it appears the anticipated results are not being obtained, in recent years the commission has provided for adjustments when there has been an extraordinary change of substantial magnitude in cost item or rate base. In the adjustment proceeding it is assumed that—except for the extraordinary item—revenues, expenses, and rate base have remained constant or have

varied proportionately to each other. Thus the extraordinary change may be isolated, and a new rate fixed on the basis of calculations from the old one. As pointed out in *City of Los Angeles* v. *Public Utilities Com., supra,* 15 Cal.3d 680, 691, in discussing an annual adjustment for a tax reserve reducing rate base: "The effect of annual adjustment in some respects resembles that which would occur if the commission each year conducted a new rate proceeding in which all factors except that of tax reserve held constant."

The abbreviated adjusted rate proceedings will always reach the same result as if the commission had undertaken a general rate proceeding and used the same test year as it did in fixing the original rate, adjusting estimated revenues, expenses, and rate base for the extraordinary item. Rather than repeat all of the arithmetic, the commission merely adjusts for the extraordinary item.

It is clear from the foregoing that, contrary to the majority, the adjustment proceeding is ratemaking. It is the fixing of rates based on the assumption that—except for the estimate of the extraordinary item and the estimate of revenue needed to offset the extraordinary item—all revenue, expense, and rate base estimates shall be fixed on the basis of the original test year. Moreover, once the adjusted rate becomes final it is the only rate which the ratepayers pay and the utility collects. There is no two-part system, an old rate and an adjustment; the old rates no longer exist.

The process used in fixing the adjusted rate is the same as the original rate proceeding, the commission not bothering to repeat its old estimates. The result of the adjustment is a new rate. Ratemaking procedures being followed and a new rate being established, we should recognize that the adjustment is ratemaking.

The majority's decision effectively abrogates the rule against retroactive ratemaking because the commission may avoid the rule whenever it chooses simply by denominating its rate-changing proceeding as an adjustment proceeding rather than a ratemaking proceeding. If we are to permit the commission to engage in retroactive ratemaking, we should require it to do the full job rather than permit it to choose its spots. The undisputed evidence in the record is that during the relevant period herein, Edison's total revenues—including those attributable to the fuel clause adjustment—were not sufficient to produce the rate of return

authorized by the commission. Instead of credits against future rates, Edison would be entitled to surcharges. While true retroactive ratemaking is fair to the utility and the ratepayers, the commission's selective retroactive ratemaking approved by the majority may be and in this case is manifestly unfair.

It must also be pointed out that the majority is not loyal to its tenets. In approving the credits, because they are products of the adjustment proceedings, the majority fail to recognize that the basis of the adjustments—changes in the *price* of oil—did in fact occur. The credits—according to the commission and the majority—are proper because the estimates of *quantity* of oil to be used proved to be erroneous. But the *quantity* estimates were fixed in the original rate proceedings—so far as I can determine they were not adjusted in the adjustment proceedings. Thus, the credits are not designed to correct an error in the adjustment proceedings but an error in the original proceedings which was merely carried forward into the adjusted proceedings on the theory that all other matters remained constant.

We must also recognize the practical consequences of today's decision.[4] While it may seem inappropriate to invoke the characterization of penny wise and pound foolish in a case that directly involves over a hundred million dollars, the saying properly reflects the consequences of the majority holding. The uncertainties resulting from today's decision can only result in downgrading the securities of all California utilities. Today's decision means that investors contemplating purchase of bonds issued by California utilities may put only very limited reliance on the balance sheets and profit and loss statements. The investor looking at those documents must be aware that they are suspect because the commission—through an adjustment not subject to the rule against retroactive ratemaking—may refix the rates, thus requiring refunds or credits. Under the new California system the investor also will be denied the certainty of rate of return which would be guaranteed in a jurisdiction establishing full retroactivity, i.e., the rates will be refixed

---

[4]These consequences would not follow from the commission's decision, but they do follow from the majority's decision which is much broader. The commission's decision is predicated in part on the theory that the utility may avoid detriments—which would otherwise occur—by the change from the old fuel adjustment clause to the new one. This is a situation which would rarely occur. The majority's decision is much broader, holding rate adjustments are not subject to the rule against retroactivity. This decision may affect every utility rate in the state.

allowing surcharges or credits to assure that the utility obtains its promised rate of return and no more.

The costs of downgrading cannot be minimized. As pointed out by the Wall Street Journal on 12 January 1978, page 19, with regard to a January 1978 bond issue of Pacific Telephone: "Pacific Telephone has the poorest credit rating among the 21 Bell System operating companies. Its obligations are classified double-A-minus by Standard & Poor's and double-A by Moody's, which lowered its rating from triple-A prior to yesterday's new sale. [¶] That downgrading by Moody's will raise Pacific Telephone's interest cost by 'approximately $35 million over the 40-year life of the $300 million issue,' an official estimated recently. Two earlier such rating reductions by Standard & Poor's effectively boosted the interest payments by about $55 million, he added. [¶] Moreover, Pacific Telephone's 61,000 bondholders 'suffer a loss in the market value of their securities of some $75 million,' Arthur C. Latno Jr., vice president for external affairs, said. 'When our debentures are downgraded for the third time in five years due to California's regulatory climate, it has to be a matter of grave concern to us and to every telephone user in the state,' he added."

Today's decision will no doubt require downgrading of Edison's debt securities because of the amount of money credited. More importantly, the uncertainties of selective retroactive ratemaking authorized by the majority will affect the credit-worthiness of all California utilities, and the potential cost will run into billions. As dissenting commissioners Symons, Jr., and Sturgeon pointed out: "It would be ironic that the fuel cost adjustment clause, legitimately introduced to enhance the position of the utilities in the financial community and to guard that their ability to function be not impaired, be turned around like a boomerang to cause these very deteriorations it was supposed to prevent."

Even assuming that Edison did obtain excess profits or a so-called "windfall" during the period of the original fuel adjustment, the price that will be ultimately exacted from the ratepayers in order to permit the credits is too great. It may easily be in the billions. Moreover, the evidence in the record directed to the profit issue shows that Edison did not obtain the rate of return authorized by the commission during the period at issue. Although the adjustments viewed alone might be said to create a "windfall," other matters created a shortfall, and Edison's activities as a whole did not result in excess profits or a windfall.

The majority claim *City of Los Angeles* v. *Public Utilities Com., supra,* 15 Cal.3d 680, shows the credit does not involve retroactive ratemaking. However, the case did not involve a refund or credit of rates fixed, final, and lawfully collected, but merely a provision for adjusting rates to be collected after the adjustment became final.

I would adhere to the rule against retroactive ratemaking and annul Decision No. 85731 insofar as it provides for the credit.

Richardson, J., and Rouse, J.,* concurred.

Petitioner's application for a rehearing was denied May 25, 1978. Tobriner, J., did not participate therein. Clark, J., and Richardson, J., were of the opinion that the application should be granted.

---

*Assigned by the Chairperson of the Judicial Council.