11WILLIAMS, Judge.
The plaintiffs, Ellis Michael, Wayne Crawford, B. David Williams, Pamela and Kelly Dickson, Daisy and T.J. Cummings, Billy Jones, S and I, Inc. and Sunkel Grocer Company, Inc.,[1] individually, and on behalf of similarly situated ratepayers, appeal the trial court’s judgment in favor of the defendants, the City of Minden, Mayor William Robertson and the members of the City Council. The trial court found that the City of Minden (“the City”) did not have a contractual obligation to refund to ratepayers an overpayment of fuel adjustment charges, that the customers received a substantial benefit from utility system improvements, and that the City’s use of the refund revenue for such purposes was a legitimate legislative function. For the following reasons, we affirm.
FACTS
The City of Minden owns and operates Minden Power & Light, a revenue-producing public utility that provides electricity to residents and financing for city services. On June 24, 1991, the City received a refund in the amount of $499,093.48. The payment was made as part of a settlement between Louisiana Power & Light (“LP & L”) and the City’s agent, Louisiana Energy and Power Authority (“LEPA”), to reimburse the cost of overcharges to LP & L’s wholesale customers, including the City, during the period from 1975 through 1980.
At the time the refund was received, the City’s outdated electricity distribution system needed substantial improvements. A partial upgrade of the system had been done through a project called the “Electric System Maintenance and Improvement Fund” (“ESMI”). Mayor Bill Robertson consulted with Ronald Judice, an attorney in Lafayette, Louisiana, regarding the propriety of using the refund to further upgrade the City’s utility system. Judice advised in a written |2opinion that such a use of the funds would be appropriate and the City Attorney agreed. In November 1992, the Minden City Council approved the expenditure of the refund proceeds for the upgrade project known as ESMI II. The City entered into an engineering service contract with Wreyford & Associates, Inc., to perform the improvements.
In September 1994, the plaintiffs filed this class action, alleging that the City did not have the authority to apply the settlement proceeds to an improvement of the utility system, but was required to distribute pro rata shares of the refund to all electric utility ratepayers during the relevant period. Aftér hearing the evidence, the trial court took the matter under advisement.
Subsequently, the trial court rendered judgment in favor of the defendants, finding that the City was not obligated to distribute *412 a refund to ratepayers, that the customers received a benefit from the upgrade project, and that the City had exercised a legitimate legislative function in spending funds to improve the utility system. Plaintiffs appeal.
DISCUSSION
The plaintiffs contend the trial court erred in finding that the City did not have a contractual obligation to refund the cost of fuel overcharges to the ratepayers. They argue that despite the lack of a written agreement, reasonable terms can be inferred from the nature of the contract and the circumstances of the case, including the law, equity and the past practice of the parties.
A contract is an agreement between two or more parties whereby obligations are created, modified or extinguished. LSA-C.C. Art. 1906. In order to form a valid contract, the parties must have sufficient capacity, give their consent freely for a certain object, and the contract must have a lawful purpose. 3LSA-C.C. Arts. 1918, 1927, 1966, 1971, (formerly LSA-C.C. Art. 1779); Leger v. Tyson Foods, Inc., 95-1056 (La.App. 3rd Cir. 1/31/96), 670 So.2d 397, writ denied, 96-0545 (La. 4/19/96), 671 So.2d 920.
The obligation of contracts extends not only to what is expressly stated, but also to everything that by law, equity or custom, is considered incidental to the particular contract, or necessary to give it effect. LSA-C.C. Art. 1903. Equity, usage and law supply such incidents only as the parties may reasonably be supposed to have been silent from a knowledge that they would be supplied from one of these sources. LSA-C.C. Art. 1964. The term, “usage,” is defined as that which is generally practiced in affairs of the same nature as the subject of the contract. LSA-C.C. Art. 1966. These Civil Code Articles, applicable from 1975 to 1980, were amended and reenacted in a 1984 revision.
In the present case, the City agreed to furnish electricity to the customer at the lowest reasonable rate in return for the customer’s payment for the service. There is no evidence of a written contract in which the City makes a commitment to charge a specific rate or to issue refunds. Despite the lack of a written agreement, plaintiffs urge that the City’s obligation to pay a refund can be inferred from the past practices of the parties.
Plaintiffs presented testimony by Wayne Youngblood, who served as Minden City Clerk from 1967 to 1984. Youngblood stated that in 1983, the City had received a previous refund, which was distributed to ratepayers as he had “recommended.” The plaintiffs contend that the City’s prior action created an implied contractual obligation that the City would distribute all future refunds to consumers. However, Youngblood’s testimony indicates that city officials exercised discretion in accepting his recommendation concerning the 1983 refund. Lin addition, the plaintiffs have not shown evidence that the mayor or city council members intended by this single act to obligate themselves, or their successor officeholders, to distribute any such refunds received by the City in the future. We cannot say the trial court was clearly wrong in finding that the single prior refund is an insufficient basis for an inference that the City was contractually obligated to distribute all future refunds to ratepayers. The assignment of error lacks merit.

Authority of Municipal Utility

The plaintiffs contend that the City was not entitled to allocate the refund proceeds toward improving the electric utility system. They argue that the fuel adjustment clauses are not designed to provide the utility with a profit and so any refund derived from adjustment overcharges must be returned to the customers.
Any municipality or parish may construct, acquire, extend or improve any revenue producing public utility and may operate and maintain the utility in the interest of the public. LSA-R.S. 33:4162. A “revenue producing public utility” is any revenue generating business or organization which regularly supplies the public with a commodity or service, including electricity. LSA-R.S. 33:4161. The municipality may establish rates, rules and regulations with respect to the sale and distribution of the utility’s service. LSA-R.S. 33:4163.
*413 In support of their argument, plaintiffs cite Daily Advertiser v. Trans-La., 612 So.2d 7 (La.1993), in which the supreme court found that the Louisiana Public Service Commission’s (“LPSC”) allowance of monthly fuel cost adjustments pursuant to adjustment clauses does not constitute rate making in the traditional sense, because such adjustments enter into effect without a prior reasonableness review. Thus, the court concluded that the LPSC retained authority to subsequently revise previously allowed cost adjustments, without violating the 1 ¡¿rule against retroactive rate making. The supreme court was addressing the issue in the context of a regulated utility’s limited return on investment.
A regulated utility’s rates are based on two distinct components, its operating expenses and its return on invested capital. The basic principle of rate making is to establish a rate which will permit the utility to recover its costs and expenses, plus a reasonable return on the value of private property devoted to public use. Southern California Edison Co. v. Public Utilities Commission, 20 Cal.3d. 813, 144 Cal.Rptr. 905, 576 P.2d 945 (1978). Thus, the regulated utility’s “return,” i.e., its profit, is calculated solely on the rate base, which is the capital contributed by investors, and the utility is not entitled to earn an additional profit on its expenses. For this reason, fuel adjustment clauses are not designed to allow a regulated utility to earn a profit, but are meant to permit a recovery of fuel costs. Daily Advertiser, supra.
Plaintiffs seek to extend this limitation to the present situation by arguing that because fuel adjustment clauses are not designed to allow the utility to earn a profit, a refund from overcharges of these adjustments must be returned to the customer. Although this result may be required in the regulatory context, and would be reasonable policy, neither the statutory provisions which authorize municipalities to operate utilities, nor the Daily Advertiser decision, impose such a restriction on the City’s unregulated authority to establish electricity rates and earn a profit. Plaintiffs’ argument lacks merit.
Citing Dixie Electric Membership Cooperative v. Louisiana Public Service Comm., 509 So.2d 1002 (La.1987), plaintiffs compare the City’s position to that of an electric cooperative which was required to distribute a refund to consumers. However, the City’s situation can be distinguished from that of a cooperative. In 6Dixie Electric, supra, the supreme court found that the cooperative was subject to regulation by the LPSC and was thus required to comply with the commission’s refund order. In contrast, the Louisiana Constitution expressly excludes the City’s operation of the utility from regulation by the LPSC. La. Const. Art. 4, § 21(C).
In their brief, plaintiffs cite two cases from other jurisdictions in which the utility was required to return its excess collections of fuel adjustment charges, either through a refund or through amortizing over a certain period of time the excess amount collected to reduce future rates. However, each of these cases involved the practices of regulated utilities. As we have noted previously, the City’s operation of its utility is not subject to such regulation. Thus, the plaintiffs above-cited authority does not provide a basis for requiring the City to distribute a refund to the ratepayers.
Plaintiffs assert that the fuel adjustment charges did not produce revenue to the City’s utility because the income was passed along to the supplier. To support their position, plaintiffs offer the testimony of Youngblood, who expressed his view that fuel adjustment income was not “true revenue” of the City. However, the plaintiffs do not present any statutory basis for their assertion that funds which are collected to pay the utility’s expenses of operation, including fuel costs, are not revenue. No such distinction is made in the definition of a revenue producing public utility contained in R.S. 33:4161.
The record also shows, contrary to plaintiffs’ assertion, that the fuel adjustment charge assessed to customers was not an automatic pass through of the City’s cost of fuel. Youngblood testified that the fuel adjustment ordinance adopted in the 1970’s provided for passing along only those fuel *414 costs in excess of ^nineteen cents per million Btu,[2] or one thousand cubic feet, of gas. The remainder was absorbed by the City. Thus, even applying plaintiffs’ logic, the adjustment overcharge refund included “revenue” from rates. Plaintiffs’ assertion lacks merit.
In addition, there is persuasive authority in support of the City’s decision regarding allocation of the refund. The case of Moody v. City of Orangeburg, 319 S.C. 184, 460 S.E.2d 374 (1995), involved a municipally owned and operated utility system which was not regulated by the state’s utility commission. Orangeburg was overcharged for special fuel costs by its supplier and subsequently received a refund. Orangeburg applied the interest portion of the refund to improvements of the utility. The South Carolina Supreme Court upheld Orangeburg’s allocation of the refund, finding that the furnishing of electricity is a governmental function, and that the municipality’s discretionary decisions made in the exercise thereof would not be disturbed unless capricious or a clear abuse of power.
In another ease, West v. City of Batavia, 155 Ill.App.3d 925, 108 Ill.Dec. 547, 508 N.E.2d 1124 (1987), the municipal utility received a refund for excess payments made to its suppUer. Illinois law authorizes municipalities to operate utilities and set their own rates without regulation by the state commerce commission. The court upheld Bata-via’s decision to apply the refund proceeds to finance improvements of the electric utility system. See also Okaloosa Asphalt Enterprises v. Okaloosa County Gas District, 524 So.2d 1095 (Fla.App.1988) (upholding independent state agency’s use of refund to retire outstanding bond debt since the decision was not arbitrary, capricious or an abuse of discretion).
Similarly in the present case, the City is authorized to operate a utility and set the rates and rules concerning the sale of electricity without regulation by the | «state public service commission. The previously noted statutory provisions neither limit the City’s allocation of funds received through the operation of the utility nor require that the City distribute the refund revenue to consumers. We find the above-cited authority persuasive. Accordingly, we cannot say that the trial court was clearly wrong in finding that the City’s use of the refund for the improvement of the utility system was an exercise of legislative authority. Therefore, the City’s decision will not be disturbed unless arbitrary, capricious or an abuse of discretion. The assignment of error lacks merit.

Arbitrary or Capricious Standard

Plaintiffs contend the trial court erred in finding that the ratepayers received a benefit from improvement of the utility system. Plaintiffs argue that the City acted arbitrarily and capriciously by failing to distribute the refund proceeds to ratepayers, by neglecting to use Depreciation and Contingency Fund money to finance ESMI II, by transferring over one million dollars from the Utility Fund to the General Fund in 1991 and 1992 after receiving the refund, and by acting without relying on competent evidence.
The City Council meeting minutes introduced into evidence indicate that official action was taken to apply the refund to the ESMI II upgrade. There was testimony at trial that an improved utility system would benefit city ratepayers through a more efficient and cost-effective delivery of electricity. Mayor Robertson testified that city officials did not want to use Contingency Fund revenue to finance the system upgrade because of the possibility of storm damage, which would require replacement of generators, and that such a use of utility funds would reduce the money available for the General Fund and require a cutback in city services.
| ¡)The Mayor explained that distributing the refund to ratepayers would be a significant administrative burden which would deplete city resources better used for services. He also testified that he sought legal advice from an attorney with expertise concerning utilities. The evidence in the record supports the trial court’s finding that ratepayers benefited from the utility improvement and that the City’s decision to apply the refund to a system upgrade was not arbitrary, capri *415 cious or an abuse of discretion. The assigned error lacks merit.

Unjust Enrichment

The plaintiffs contend that the City was unjustly enriched by receipt of the overcharge refund and that ratepayers were impoverished in being denied reimbursement. To recover for unjust enrichment, a plaintiff must prove an enrichment, an impoverishment, a connection between them, an absence of justification and the lack of another remedy at law. Baker v. Maclay Properties Co., 94-1529 (La. 1/17/95), 648 So.2d 888.
Plaintiffs have not established an improper enrichment by the City. As previously noted, the City is authorized by statute to operate a revenue producing utility and to set rates and rules for the sale of electricity. We have concluded that allocation of the refund was within the City’s authority. There was evidence of a need to replace old transformers, which contained carcinogenic polychlorinated biphenyls (PCB’s), and to purchase new equipment. The trial court was not clearly wrong in finding that the City was justified in applying the refund revenue to an improvement of the utility operation. The assignment of error lacks merit.

Due Process

The plaintiffs contend that the City violated the ratepayers’ constitutional rights to property and due process by failing to distribute a refund. A person shall | i0not be deprived of property without due process. U.S. Const. Fifth and Fourteenth Amendments; La. Const. Art. 1, § 2. The guarantee of due process contained in the federal and state constitutions requires only that the legislative act have a rational relationship to a legitimate state interest. City of New Orleans v. Dukes, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976); Theriot v. Terrebonne Parish Police Jury, 436 So.2d 515 (La.1983).
In the present case, the City’s decision to apply the refund revenue to finance an upgrade of the utility system was rationally related to its legitimate interest in improving the delivery of electricity to its residents. Based upon this record, we cannot say the trial court was clearly wrong in finding that plaintiffs failed to show that the City’s allocation of the refund was imprudent. The assignment of error lacks merit.
CONCLUSION
For the foregoing reasons, the trial court’s judgment is affirmed. Costs of this appeal are assessed to the appellants, Ellis Michael, Wayne Crawford, B. David Williams, Pamela and Kelly Dickson, Daisy and T.J. Cummings, Billy Jones, S and I, Inc. and Sunkel Grocer Company, Inc.
AFFIRMED.

. Plaintiffs filed a second supplemental and amended petition on February 27, 1996, to add the commercial ratepayers as plaintiffs.

. British thermal units.