[No. F061287. Fifth Dist. July 5, 2011.]

THE PONDEROSA TELEPHONE CO., Petitioner, v.
PUBLIC UTILITIES COMMISSION, Respondent;
CALAVERAS TELEPHONE COMPANY et al., Real Parties in Interest.

**50**

COUNSEL

Pillsbury Winthrop Shaw Pittman, Kevin M. Fong, James B. Young; Wagner & Wagner, James F. Wagner and Matthew C. Wagner for Petitioner.

Frank R. Lindh, Helen W. Yee and Carrie G. Pratt for Respondent.

Munger, Tolles & Olson, Henry Weissmann and Hojoon Hwang for Real Parties in Interest Happy Valley Telephone Company, Hornitos Telephone Company and Winterhaven Telephone Company.

Cooper, White & Cooper, E. Garth Black, Mark P. Schreiber, Stephen D. Kaus, Cyrus Wadia and Patrick M. Rosvall for Real Parties in Interest Calaveras Telephone Company, Cal-Ore Telephone Co., Ducor Telephone Company, Kerman Telephone Co., Sierra Telephone Company, Inc., The Siskiyou Telephone Company and Volcano Telephone Company.

OPINION

**LEVY, Acting P. J.**—In this original proceeding, and the two companion proceedings (*Happy Valley Telephone Co. v. Public Utilities Com.* (July 5, 2011, F061259) [nonpub. opn.]; *Calaveras Telephone Co. v. Public Utilities Com.* (July 5, 2011, F061306) [nonpub. opn.]), 11 rural telephone companies challenge California's Public Utilities Commission (Commission) decision No. 10-06-029, as modified by decision No. 10-10-036 (Decision). The Decision allocates the proceeds from the redemption of Rural Telephone Bank (RTB) stock to the telephone companies' ratepayers. The subject stock was issued by the RTB in one of two ways. First, as a condition of receiving a loan from the RTB, a rural telephone company was required to purchase an amount of stock equal to 5 percent of the loan proceeds. Second, if the total interest received by the RTB from its borrowers exceeded its expenses and reserve requirements, the RTB issued patronage refunds to the rural telephone companies in the form of additional shares of stock. When the RTB was dissolved, this stock was redeemed for par value. This court issued a writ of review to consider the Decision.

Petitioner, The Ponderosa Telephone Co. (Ponderosa), contends that it owned the RTB shares. Accordingly, Ponderosa argues, the Commission's

action in allocating the share proceeds to the ratepayers constituted an unlawful taking of Ponderosa's property, resulted in improper retroactive ratemaking, and was contrary to the Commission's own rules. Ponderosa further asserts that it was denied due process and that the Decision is not supported by either substantial evidence or adequate findings.

█ As discussed below, the Commission erred in allocating both the purchased share proceeds and the patronage share proceeds to the ratepayers. Therefore, the Decision will be annulled.

## BACKGROUND

1. *Ratemaking principles and procedures.*

Ponderosa provides telephone service in rural areas of three counties and is subject to the Commission's regulatory authority. The Commission periodically establishes the rates Ponderosa charges for telephone service in general rate case proceedings using a cost-of-service or rate-of-return model. Under this structure, the Commission examines the company's costs in a test year and determines the company's revenue requirement during that test year.

The Commission examines several cost components in calculating a utility company's revenue requirement. The Commission begins by determining the value of the assets that the company has invested in to provide utility service. Property or portions thereof that are unproductive for public utility purposes are excluded. This figure is known as the "rate base."

To invest in rate base assets, a utility company raises funds by either issuing debt or selling equity. Costs are associated with each method. The company either has to pay interest to creditors on borrowed funds or pay a portion of profits or dividends to equity investors, i.e., shareholders. This cost is known as the cost of capital. The cost of capital, also known as the rate of return, multiplied by the rate base is one component of the utility company's revenue requirement.

Utility companies usually use a mix of debt financing and equity as a source of funds for their regulated activities. The reason is that, while debt is cheaper to obtain, it increases financial risks to the shareholders. Interest must be paid to creditors regardless of how the company is doing financially. On the other hand, shareholders expect an annual return that is usually greater than the cost of debt. Accordingly, companies attempt to find a middle ground between all-equity financing and all-debt financing.

The Commission determines a utility company's cost of capital in a three-step process. The Commission first adopts a reasonable capital structure, i.e., the proportion of debt to equity that a utility company should use to

finance its capital needs. Next, the Commission calculates the company's cost of debt, based on the actual cost of the company's outstanding debt during the most recent period. Third, the Commission determines the appropriate return on the equity component of the utility company's capital by examining returns for businesses with comparable risks. Applying the resulting figures to the adopted capital structure produces the weighted cost of capital. This weighted cost of capital becomes the utility company's authorized rate of return on rate base. Alternatively, the Commission may simply apply an overall rate of return without regard to a specific capital structure.

As noted above, the Commission determines the utility company's rate base and multiplies that number by the authorized rate of return. This figure is then added to the company's operating expenses and tax costs. The sum is the company's revenue requirement, i.e., the amount needed to cover the company's costs and provide a reasonable return on its investments.

The Commission sets rates that are designed to enable a telephone company to generate sufficient revenue to meet the revenue requirement. In rural areas the cost of providing service is high. Nevertheless, the Commission limits rates for rural customers to 150 percent of urban area rates. To make up the difference between the permitted rural rates and the actual cost of service, eligible telephone companies receive subsidies from the California High Cost Fund-A. Surcharges assessed against all California telephone customers provide these funds.

## 2. *The Rural Telephone Bank.*

In 1971, Congress created the RTB, the purpose of which was to make capital available to rural telephone providers at reasonable costs for investment in infrastructure. RTB's initial cash infusion of $600 million was provided by the federal government. In exchange, the RTB issued class A stock to the Administrator of the Rural Utilities Service.

A second form of financing for the RTB was class B stock. As a condition of obtaining a loan, RTB customers were required to purchase class B stock in an amount equal to 5 percent of the RTB loan. These customers could either purchase this stock with cash or borrow additional money from the RTB to finance the stock purchase. Class B shares had a par value of $1. However, these shares were not transferable and paid no dividends.

RTB borrowers were also eligible to receive what the RTB called "patronage refunds" in the form of class B stock. These patronage shares were a partial rebate of the interest paid to the RTB and were distributed when the RTB determined that the interest it had received from its borrowers exceeded

its costs. A company's patronage refund was based solely on the dollar amount of interest it paid, not the number of class B shares it held. Again, being class B shares, the patronage stock could not be transferred and paid no dividends.

The RTB also issued class C stock. Class C stock had a par value of $1,000 and paid dividends. This stock could be acquired in one of two ways. RTB customers could either make discretionary purchases of class C shares or could convert class B shares to class C shares at any time after the RTB loan that necessitated the purchase of the class B shares had been repaid.

In 2005, the RTB board, with congressional approval, dissolved the RTB and initiated the stock redemption process. Beginning in 2006, all class B and class C shares were redeemed at par value, i.e., $1 per share and $1,000 per share respectively. In November 2007, the RTB distributed its remaining funds as residual amounts to all class B shareholders at a rate of $0.04435 per share.

3. *Ratemaking treatment of the RTB stock.*

The Commission did not explicitly address the appropriate ratemaking treatment of the RTB stock for the years 1972 through 1996. The first direct Commission action on this stock occurred 25 years after the telephone companies' initial loans when the Commission conducted general rate cases for most of those companies.

In 1997 Ponderosa filed a general rate case advice letter with the Commission. At that time, Ponderosa proposed to include the class B stock obtained with 5 percent of RTB loan proceeds in its rate base. However, the Commission rejected this request. The Commission further directed Ponderosa to file an application requesting the Commission to determine the appropriate ratemaking treatment for the gain on the RTB stock when those shares were redeemed.

The Commission also excluded the RTB stock from the outstanding balance of long-term debt. This exclusion resulted in an increase in Ponderosa's cost of debt. However, the exclusion of the RTB shares in calculating Ponderosa's long-term cost of debt had no effect on its authorized rate of return. Rather, the Commission adopted a generic 10 percent authorized rate of return without reference to Ponderosa's actual cost of debt.

Beginning in 2004, the Commission authorized Ponderosa to include its purchased class B shares in rate base. Accordingly, Ponderosa earned its authorized rate of return on those shares from January 1, 2004, until April 11, 2006.

4. *The underlying administrative proceeding.*

In December 2007, following the final RTB stock redemption payment, Ponderosa, together with the other rural telephone companies, filed an application with the Commission seeking a ratemaking determination regarding any gain on the redemption. These companies proposed to credit the ratepayers with 67 percent of the gain, i.e., the $0.04435 per share residual amount, for the purchased class B shares that five of the 11 companies included in rate base between 2004 and 2006. For Ponderosa, this amount was $2,558.

The proposal to limit the credit to 67 percent of the gain was based on an earlier Commission decision regarding allocation of gains on sale of utility assets. In that decision, *Opinion Regarding Allocation of Gains on Sale of Utility Assets* (2006) Cal. P.U.C. Dec. No. 06-05-041, as modified by Cal. P.U.C. Order Modifying Decision No. 06-05-041 (2006) Cal. P.U.C. Dec. No. 06-12-043 (Gains on Sale Decision), the Commission determined that the gain on the sale of nondepreciable utility assets included in rate base should be allocated 67 percent to the ratepayers and 33 percent to the shareholders. The Commission concluded that incidence of risk is the best determinate of how to allocate gains and losses on sale. Accordingly, because ratepayers bear the major portion of risks and provide a return on utility assets in rate base, they should share in the associated gain. However, the Commission also held that, where property is never in rate base, all gains or losses should accrue to the shareholders.

The administrative law judge (ALJ) assigned to the case issued a proposed decision in September 2009. The ALJ concluded that the telephone companies had not met their burden of proving that the shareholders incurred the costs of acquiring the stock. Finding that the purchase price of the RTB stock was a cost of obtaining a loan and was included in evaluating the companies' cost of capital in setting the revenue requirement to be recovered from the ratepayers, the ALJ determined that the ratepayers incurred the cost. Accordingly, the ALJ concluded that the ratepayers should be credited with all stock redemption proceeds.

In response, the telephone companies moved to reopen the record to provide additional evidence and argument. The ALJ granted this motion. The telephone companies filed additional evidence, including verified written testimony of two experts and a full accounting of all RTB stock proceeds, and requested that the Commission take official notice of its past decisions and resolutions involving the companies and relating to the RTB stock.

The ALJ issued revised proposed decisions in December 2009 and February 2010. The telephone companies again moved to reopen the record arguing

that three new evidentiary issues appeared in the revised proposed decisions. The companies objected to the revised decisions' reference to previous Commission decisions and income tax liability and the suggestion that the companies had agreed to a different treatment of the RTB stock in the 1997 rate cases. The ALJ denied this motion.

## 5. *The Commission's Decision.*

In the Decision, the Commission found that the 11 rural telephone companies received approximately $31 million from the RTB stock redemption and that this amount should be credited to the ratepayers.

The Commission first noted that the RTB stock was a public utility asset and the 2006 redemption amounted to a sale of this asset. Accordingly, the Commission turned to its Gains on Sale Decision for guidance in resolving this case. The Commission further pointed out that under Public Utilities Code[1] section 817, it could only authorize the encumbrance of public utility property for public utility purposes.

The Commission considered the class B patronage shares and the purchased class B shares separately. Regarding the patronage shares, the Commission concluded that, because the interest payments were supplied by the ratepayers through the regulated revenue requirement, the ratepayers furnished the funds that led to the patronage refund stock. The Commission held that, therefore, both the par value redemption and the above par payments on the patronage refund shares should benefit the ratepayers, i.e., the parties who bore the original costs of acquiring the stock.

The Commission found that the shares that were required to be purchased with 5 percent of the loan funds were a cost of obtaining the loan, not a shareholder-funded capital purchase. Because these capital costs were reflected in the companies' regulated revenue requirement and recovered from the ratepayers, the Commission concluded that the redemption proceeds should be returned to the ratepayers.

## DISCUSSION

## 1. *Standard of review.*

Under section 1756, this court has jurisdiction to review Commission decisions through petitions for writ of review. (§ 1756, subd. (a).) Such review is discretionary rather than mandatory. (*Southern Cal. Edison Co. v.*

---

[1] All further statutory references are to the Public Utilities Code.

*Public Utilities Com.* (2005) 128 Cal.App.4th 1, 9 [26 Cal.Rptr.3d 700].) Nevertheless, because petitions for writ of review serve in effect as appeals, they are not to be summarily denied on policy grounds unrelated to their merits. (*Pacific Bell v. Public Utilities Com.* (2000) 79 Cal.App.4th 269, 282, fn. 8 [93 Cal.Rptr.2d 910].)

This court's review of the Decision is governed by section 1757. Pursuant to that section, review cannot extend further than to determine whether (1) the Commission acted without, or in excess of, its powers or jurisdiction; (2) the Commission acted contrary to a statute or to the state or federal Constitution; (3) the Commission's decision is not supported by the findings or those findings are not supported by substantial evidence; or (4) the Commission abused its discretion. (§ 1757, subd. (a).)

Moreover, the Commission is not an ordinary administrative agency, but, rather is a constitutional body with broad legislative and judicial powers. Accordingly, the Commission's decisions are presumed valid. (*Southern Cal. Edison Co. v. Public Utilities Com.* (2000) 85 Cal.App.4th 1086, 1096–1097 [102 Cal.Rptr.2d 684].) However, where a Commission decision is challenged on the ground that it violates a constitutional right, the reviewing court must exercise independent judgment on the law and the facts and the Commission's findings or conclusions material to the constitutional question shall not be final. (§ 1760.)

2. *The purchased class B shares.*

As outlined above, as a condition of receiving loans from the RTB to be used to provide public utility service, the telephone companies were required to purchase class B stock in an amount equal to 5 percent of the loan proceeds. The telephone companies could either purchase this stock with cash or borrow additional money from the RTB to finance the stock purchase. Thus, this 5 percent purchase was an investment the telephone companies were required to make in order to borrow money to provide public utility service. Moreover, the telephone companies bore the risk of loss if the purchased shares became worthless, in that the telephone companies were responsible for paying back the entire amount of the loan, including the portion used to fund the stock purchase.

■ A public utility may only issue evidence of equity or indebtedness for purposes related to providing public utility service to customers and such issue must be authorized by the Commission. (§§ 817, 818.) The Commission found that, because the telephone companies could only encumber their property to provide public utility service (§§ 817, 818) and the loans were used to provide public utility service as required, the purchased shares were

public utility assets that fell within the scope of the Gains on Sale Decision. Under that decision, upon the sale of nondepreciable public utility property, the acquisition cost of that property is allocated to the shareholders and the gains or losses are allocated 67 percent to the ratepayers and 33 percent to the shareholders. However, this disposition only applies to assets that were in rate base. For nonutility assets held out of rate base, all gains and losses accrue to the shareholders.

As explained by the Commission in the Decision, the central question at issue was who owned the RTB stock. The telephone companies purchased the shares but financed them with debt. However, the fact that a utility incurs debt to acquire an asset does not divest the utility of ownership of that asset. Rather, the Commission requires a utility to finance its capital needs with a balance of debt and equity and adopts what it considers to be a reasonable capital structure, i.e., debt-to-equity ratio, for that utility. For the rural telephone companies the Commission concluded that 40 percent debt and 60 percent equity was reasonable. As noted by the Commission, such a balance is necessary because ratepayers pay more on a high-equity company while a high-debt company faces higher risks.

■ Moreover, it has long been established that "[b]y paying bills for service [utility customers] do not acquire any interest, legal or equitable, in the property used for their convenience or in the funds of the company." (*Board of Commrs. v. N. Y. Tel. Co.* (1926) 271 U.S. 23, 32 [70 L.Ed. 808, 46 S.Ct. 363].) Rather, "[c]ustomers pay for service, not for the property used to render it." (*Ibid.*) The revenue paid by the customers belongs to the company. (*Id.* at p. 31.) Similarly, in the Gains on Sale Decision, the Commission explicitly rejected the notion that ratepayers hold legal title to utility property by virtue of bearing costs associated with utility property, including carrying costs. As noted by Justice Marshall in his concurring opinion, the fact that the utility recovers its costs through rates cannot affect the utility's ownership of its property. (*Pacific Gas & Elec. Co. v. Public Util. Comm'n* (1986) 475 U.S. 1, 22–23, fn. 1 [89 L.Ed.2d 1, 106 S.Ct. 903] (conc. opn. of Marshall, J.).)

Despite this established rule, the Commission concluded that the proceeds from the class B stock that was purchased by the telephone companies should benefit the ratepayers. In reaching this determination, the Commission relied on the ratemaking history for these shares.

The Commission first noted that it did not explicitly address the appropriate ratemaking treatment until 25 years after the initial loans when, in 1997, it conducted general rate cases for most of the companies. In these 1997 decisions, the Commission rejected the telephone companies' requests to

include the purchased shares in rate base and excluded RTB stock from the outstanding balance of long-term debt. However, the Commission changed its treatment of this stock for five companies, including Ponderosa, and included the shares in rate base between 2004 and 2006. The Commission explained that, although it had found the shares to be public utility assets, when it rejected the companies' 1997 requests to place the shares in rate base, it *perceived* the cost of the stock as a cost of obtaining the loan, not as a shareholder-funded capital purchase. Moreover, the Commission stated, these capital costs were reflected in the companies' regulated revenue requirement and thus recovered from the ratepayers. The Commission found that its decision to adopt an overall cost of capital in 1997 without specific regard to each element of debt to be insignificant. The Commission also dismissed the recent inclusion of a small share of the stock in rate base as being insufficient to change its ratemaking conclusion.

Based on the above analysis, the Commission placed the burden on the telephone companies to demonstrate that the shareholders separately funded the purchased stock as an unregulated investment, i.e., an investment held out of rate base that should be allocated to the shareholders, and concluded that they did not meet this burden. Moreover, the Commission noted that because the RTB mortgages were limited by section 817 to public utility purposes, those purchased shares could not be an unregulated investment to be held by the shareholders out of rate base. In other words, this required investment was for public utility purposes and thus cannot be considered a shareholder private investment, i.e., it is a public utility asset, but the shareholders must demonstrate that it was a shareholder private investment before they are entitled to recover the acquisition cost of this public utility asset.

The Commission's Decision on the purchased stock is incorrect. As noted above, the telephone companies were required to invest in the class B stock to provide utility service and therefore it was a public utility asset. The fact that this investment was funded through debt, and thus included in the companies' cost of capital, did not transfer ownership of this stock to the ratepayers. The Commission requires the companies to employ debt as part of their capital structure. If the repayment of debt through regulated rates were found to impact ownership of public utility assets, and if for example, the companies were required to maintain a 40 percent long-term debt ratio, the ratepayers would own 40 percent of the public utility assets. This is not the law. (*Board of Commrs. v. N. Y. Tel. Co., supra*, 271 U.S. at pp. 31–32.)

Further, the Commission's "perception" of the character of the purchased shares is not determinative of the proper ratemaking treatment. Again, the telephone companies were required to make this investment as part of providing public utility service and bore the risk of loss. Being an asset

required for public utility service, the stock should have been included in rate base. Clearly, the Commission later came to this conclusion when it included these shares in rate base for the five companies that filed general rate cases after 1997. The fact that these purchased shares were not universally held in rate base does not change their nature. They were a regulated investment that should have been in rate base.

The Commission's contrary and circular reasoning as to the character of these shares is not persuasive. The Commission's analysis begins with finding that the purchased stock is a public utility asset, the redemption of which is a public utility asset sale subject to the Gains on Sale Decision. The Commission then "start[s] with the proposition that traditional ratemaking principles, as reflected in the [Gains on Sale Decision], would indicate that an asset, such as shares of stock, purchased with loan proceeds secured by mortgages on public utility property as a requirement for Commission-approved loans would be used and useful public utility property that would properly be carried in a public utility's rate base." The Commission then notes that only a small share of the total amount of the purchased RTB stock has ever been in rate base, and only since 2004. However, as noted above, the reason for the shares not being in rate base, at least since 1997, was the Commission's decision to "opt[] for a 'different treatment' for the stock." The Commission then concludes that, to be entitled to the proceeds of the stock redemption, the shareholders must demonstrate that they separately funded the purchased stock as an unregulated investment. However, the Commission explains, such a result is precluded by the Commission's having approved the loans because, under section 817, the shareholders cannot encumber public utility property for their private interests. In other words, because we, the Commission, decided at one point that these shares that would otherwise be properly carried in rate base should not be carried in rate base, you, the shareholders are precluded from receiving the proceeds to which you other-wise would have been entitled. This analysis cannot stand. The Commission cannot change the character of a public utility asset by improperly excluding it from rate base.

Accordingly, the class B shares purchased by Ponderosa were public utility assets that were owned by Ponderosa. Therefore, the Commission's decision to credit the par value redemption proceeds of those shares to the ratepayers constituted an illegal appropriation of Ponderosa's property. (*Brown v. Legal Foundation of Wash.* (2003) 538 U.S. 216, 233, 235–236 [155 L.Ed.2d 376, 123 S.Ct. 1406]; *Webb's Fabulous Pharmacies, Inc. v. Beckwith* (1980) 449 U.S. 155, 163–164 [66 L.Ed.2d 358, 101 S.Ct. 446].) Ponderosa is entitled to all proceeds from the redemption of those shares with the exception of the gain, i.e., the $0.04435 per share residual amount, attribut-able to the shares in rate base between January 1, 2004, and April 11, 2006.

That gain should be allocated 67 percent to the ratepayers and 33 percent to the shareholders under the Gains on Sale Decision.

In light of this conclusion, it is unnecessary to address Ponderosa's assertion that the Commission's allocation of the purchased shares to the ratepayers is not supported by sufficient evidence or findings.

### 3. *The patronage class B shares.*

As noted above, the telephone companies received patronage class B shares as refunds of interest paid on the RTB loans. These patronage shares were issued in the companies' names on an annual basis in proportion to the interest the companies paid on their RTB loans. The telephone companies analyze these shares in the same manner as the purchased shares. However, the different nature of the patronage shares mandates a separate analysis.

The Commission found that the patronage stock was a regulated asset and that its redemption fell within the Gains on Sale Decision. The Commission pointed out that there was no dispute that each company's regulated revenue requirement included the cost of debt. The Commission then explained that, implicit in the Gains on Sale Decision is the concept that, upon sale of a regulated asset, the original cost is returned to those who paid for the asset. Since the patronage shares were refunds of interest paid on the RTB loans and the interest payments were supplied by ratepayers through the regulated revenue requirement, the Commission determined that the redemption amount should benefit the ratepayers, i.e., those who bore the original costs of acquiring the stock.

The Commission further concluded that the ratepayers should also be entitled to the residual $0.04435 per share. The Commission relied on the absence of the factors that trigger the Gains on Sale Decision's sharing formula. Contrary to the usual sale of a utility asset, the shareholders did not provide the capital at risk in acquiring the asset and, moreover, were entirely passive owners. The Commission additionally noted that, because the ratepayers, and not the shareholders, funded this asset, any revenue realized from the asset should be credited to the ratepayers because to do otherwise would result in a windfall for the shareholders.

Ponderosa contends that the Commission acted in excess of its authority when it allocated the patronage stock redemption proceeds to the ratepayers because this allocation constituted retroactive ratemaking. Ponderosa asserts that the effect of this allocation is to reduce the past rates based on a reduction in the cost of loans made by the RTB. In other words, because the patronage shares reflect a reduction in the cost of the loans, i.e., an interest

rebate, the Commission's refund order flows back to the ratepayers the cost savings that Ponderosa realized on past loan payments that were considered in the general rate proceedings. Ponderosa is correct.

█ The fixing of utility rates by the Commission is a legislative act and the standard is that of reasonableness. (*Pacific Tel. & Tel. Co. v. Public Util. Com.* (1965) 62 Cal.2d 634, 647 [44 Cal.Rptr. 1, 401 P.2d 353].) Responsibility for rate fixing, insofar as the law permits and requires, is placed with the Commission, and unless its action is clearly shown to be confiscatory, the courts will not interfere. (*Ibid.*) Nevertheless, the Commission does not have the power to roll back general rates already approved by it or to order refunds of amounts collected pursuant to such approved rates. (*Id.* at p. 650.) Thus, if established rates prove insufficient to allow a utility to recover its reasonable costs, the utility cannot request compensation to remedy the revenue shortfall caused by those inadequate rates. Similarly, if established rates allow for recovery beyond the target rate of return, the Commission cannot require a utility to refund that additional revenue. In other words, the Commission has the power to fix rates prospectively only. (*Southern Cal. Edison Co. v. Public Utilities Com.* (1978) 20 Cal.3d 813, 816 [144 Cal.Rptr. 905, 576 P.2d 945] (*Southern Cal. Edison*).)

Here, the Commission established rates for Ponderosa based, in part, on its estimate of Ponderosa's costs. These costs included interest on the RTB loans. The RTB patronage shares represented a reduction in this interest expense. Thus, when the RTB redeemed the patronage shares, those proceeds related to a past cost that was factored into the rate established at that time. Accordingly, when the Commission credited the redemption proceeds to the ratepayers, it was, in effect, adjusting previously established rates to account for the cost savings the telephone companies realized on their past loan payments. Because the Commission's decision on the patronage shares is based on costs that were incurred in the past and used to establish prior general rates, the Decision violates the rule against retroactive ratemaking. The Commission relies on a cost forecast to set general rates and cannot reset those rates when the actual costs differ from the forecast. By doing so here, the Commission acted in excess of its authority. Therefore, the Decision is invalid.

In analogous situations, courts have made similar rulings. For example, in *Public Utilities Com. of State of California v. F.E.R.C.* (D.C. Cir. 1990) 282 U.S. App.D.C. 332 [894 F.2d 1372], a natural gas company used accelerated depreciation when computing taxes. However, in estimating its cost of service for ratemaking purposes, the gas company computed its tax expense as if it had used ordinary depreciation. Accordingly, the gas company was able to charge its customers more in tax costs in the early years of an

asset's life than it paid out in taxes. These temporary tax savings went into a deferred tax account, earmarked for future tax liabilities. However, due to a change in the law, the gas company stopped setting rates based on cost-of-service pricing. Thus, the question arose as to the proper disposition of the funds in the gas company's deferred tax account, funds composed of rate revenue that the gas company had already collected.

The court held that the deferred tax funds should be retained by the gas company. Any other result would violate the rule against retroactive ratemaking. The court noted that a refund of such property, or its earnings, would effectively force the gas company to return a portion of rates approved by the Federal Energy Regulatory Commission and collected by the gas company. (*Public Utilities Com. of State of California v. F.E.R.C., supra*, 894 F.2d at p. 1383.) The court concluded that the Federal Energy Regulatory Commission's order to credit the earnings on the deferred tax funds to rates to be charged going forward was in substance a retroactive adjustment of prior rates and reversed that portion of the order. The court observed that the "rule against such revision operates sometimes to protect customers from surcharges and at others to protect gas companies from refunds; its equity lies in its steady application regardless of what party is seeking to reexamine the past." (*Id.* at p. 1384.)

Here, as in *Public Utilities Com. of State of California v. F.E.R.C., supra*, 894 F.2d 1372, the funds at issue relate to utility costs that were paid in the past, i.e., the cost of debt reflected in the patronage shares and the tax costs reflected in the deferred tax account. In both cases, the agency set rates based on a forecast of costs and the agency cannot reset those rates when the actual costs turn out to be different than the forecast. The rule against retroactive ratemaking prevents the agency from forcing a utility to disgorge the proceeds of rates that have been finally approved and collected, as well as the fruits of those proceeds. (*Id.* at p. 1384; see also *Associated Gas Distributors v. F.E.R.C.* (D.C. Cir. 1990) 898 F.2d 809, 810.)

The Commission relied on *Southern Cal. Edison, supra*, 20 Cal.3d 813, in analyzing the situation presented here. In *Southern Cal. Edison*, the Commission set a general rate for Southern California Edison Company (Edison). In estimating Edison's costs, the Commission based Edison's fuel costs for 1972 on actual prices paid in the period preceding the decision. However, shortly thereafter, Edison's fossil fuel costs rose substantially. In response, Edison applied for immediate rate relief and for authority to amend its tariff to include an adjustment clause permitting periodic future billing adjustments to reflect future fuel cost increases. The Commission granted an immediate rate increase and authorized the requested fuel clause. (*Id.* at p. 817.)

Over the next two years, Edison invoked the fuel clause at every opportunity and raised its rates. However, due to a weather-related increase in the availability of hydroelectric power, a much cheaper source of energy than fossil fuels, Edison spent considerably less for fossil fuels than it had estimated in computing its adjustment under the fuel clause. Accordingly, Edison was left holding more money than it needed to offset increased fuel costs.

The Commission required Edison to amortize these overcollections through billing credits to its customers. Edison objected on the ground that, because these funds were lawfully collected pursuant to an authorized rate structure, the order to return them constituted illegal retroactive ratemaking. The California Supreme Court disagreed and ruled in favor of the Commission.

■ The *Southern Cal. Edison* court observed that, before there can be retroactive ratemaking there must at least be ratemaking. (*Southern Cal. Edison, supra,* 20 Cal.3d at p. 817.) The purpose of the fuel clause was primarily to permit Edison to "recover" its increased fuel costs in an expedited manner on a dollar-for-dollar basis. (*Id.* at p. 819.) The court concluded that, in authorizing Edison every few months to adjust its rates by operation of the fuel clause, the Commission was not engaging in ratemaking. (*Id.* at pp. 829–830.) Ratemaking requires a full hearing in which many variables are taken into account and broad policies are formulated. (*Id.* at p. 828.) Such a hearing is not required each time the rate is changed by application of an adjustment clause. (*Id.* at p. 829.) Accordingly, the rates fixed by operation of the fuel clause were not " 'general rates' but 'extraordinary rates not created by or in a general rate proceeding.' " (*Id.* at p. 830, fn. 21.) Because the increased charges were not the products of ratemaking, the billing credits required by the Commission were not rendered inviolable by the rule against *retroactive* ratemaking. (*Id.* at p. 830.) "To put it another way, the commission's decision to further adjust those rates so as to compensate for substantial past overcollections may well be retroactive in effect, but it is not retroactive *ratemaking.*" (*Ibid.,* fn. omitted.)

Contrary to the Commission's position, *Southern Cal. Edison* does not dictate the result here. In this case, there were no special surcharges or " 'extraordinary rates not created by or in a general rate proceeding.' " Rather, the rates were set by the Commission in general rate proceedings held in 1997 and in subsequent years. Those Commission decisions constituted "general ratemaking." The Commission's allocation of the patronage share redemption proceeds to the ratepayers rests on the premise that the amounts collected pursuant to the approved general rates were excessive because they overstated the cost of debt. Thus, the Decision retroactively revises costs that formed the basis for prior general rates. This is precisely the type of action

prohibited by the retroactive ratemaking doctrine. Such a rollback of general rates already approved by the Commission and refund of amounts collected pursuant to such approved rates constitutes retroactive ratemaking and therefore is invalid. (*Pacific Tel. & Tel. Co. v. Public Util. Com., supra*, 62 Cal.2d at p. 650.)

In sum, the Commission's decision to credit the patronage share redemption proceeds to the ratepayers adjusts previously approved rates. Moreover, these rates were established in general ratemaking proceedings. Therefore, the Commission's decision violates the retroactive ratemaking doctrine. Accordingly, that decision was in excess of the Commission's authority and is invalid.

## DISPOSITION

The Decision is annulled. The cause is remanded to the Commission for reallocation of the class B share redemption proceeds in accordance with this opinion. Costs on appeal are awarded to petitioner.

Gomes, J., and Kane, J., concurred.

A petition for a rehearing was denied July 29, 2011, and respondent's petition for review by the Supreme Court was denied October 19, 2011, S195658.