Filed 8/7/23 Certified for Publication 8/24/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| KERMAN TELEPHONE CO., et al.,<br><br>    Petitioners,<br><br>        v.<br><br>PUBLIC UTILITIES COMMISSION,<br><br>    Respondent;<br><br>PUBLIC ADVOCATES OFFICE AT THE PUBLIC UTILITIES COMMISSION,<br><br>    Real Party in Interest. | F083940<br><br>(CPUC Decision Nos. 19-12-041 & 22-01-018)<br><br>**OPINION** |

ORIGINAL PROCEEDINGS; petition for writ of review.

BRB Law, Patrick M. Rosvall and Sarah J. Banola, for Petitioners.

Christine Hammond, Dale Holzschuh, and Carrie G. Pratt for Respondent.

No appearance for Real Party in Interest.

-ooOoo-

This original proceeding involves a protracted legal battle between several rural telephone companies and the Public Utilities Commission ("Commission"). The petitioners in this proceeding are Kerman Telephone Company, Volcano Telephone

Company, and Sierra Telephone Company, Inc. ("Petitioners"). Petitioners are telephone corporations that provide telephone service in rural areas.

The saga dates back to 2007, after the Rural Telephone Bank ("RTB") had just dissolved and redeemed all shares of stock it had issued. Many telephone companies, including Petitioners, owned RTB stock. Years before the stock redemption, the Commission had directed some telephone companies, including two of the Petitioners, to file an application with the Commission when any RTB stock they owned was redeemed to determine the ratemaking treatment of the gain on the redemption.

Acting under those Commission directives, eleven telephone companies, including Petitioners, jointly filed an application in 2007. Some applicants had stock included in rate base for at least some period, while the rest, including Petitioners, never had stock in rate base. In simple terms, a public utility company's rate base is the total value of the company's assets used to provide utility service. It is an important factor in determining the rates a company can charge its customers.

The Commission had clarified in a 2006 decision that all gains on the sale of public utility company assets that were never in rate base accrue to company shareholders. Relying on this decision, the companies that never had stock in rate base so stated in the application and did not disclose any of their redemption proceeds. The companies that had stock in rate base only partially disclosed their proceed amounts. In response to Commission inquiries, the companies eventually disclosed the full amount of their proceeds, totaling over $31 million.

After the disclosure, the Commission issued an order to show cause to the companies for why they should not be penalized for violating Rule 1.1 of the Commission's Rules of Practice and Procedure, which prohibits misleading the

2.

Commission in a filing, by not disclosing the full amount of the redemption proceeds in their initial application.[1]

After an eight-day evidentiary hearing, the Commission issued Decision No. 19-12-041[2] which penalized the companies in the amount of $2,752,000 for violating Rule 1.1. The companies challenged the decision in an administrative appeal, but the Commission denied rehearing in Decision No. 22-01-018.

In this original proceeding, Petitioners assert many bases for annulling the penalty decision and the decision denying rehearing. Their first basis is that the decisions violate their due process rights under the United States and California Constitutions because Petitioners were penalized without fair notice. They argue that when they filed their initial application, they did not have fair notice that they were required to disclose their redemption proceeds in the application. They maintain they properly relied on the Commission's 2006 decision that held that public utility company assets not held in rate base belong to company shareholders, not ratepayers.

Applying federal due process principles, we agree Petitioners lacked fair notice of their obligation to disclose their redemption proceeds in the 2007 application. We will annul the penalty decision (Decision No. 19-12-041) and the decision denying rehearing (Decision No. 22-01-018) as to Petitioners on that basis and therefore need not address any of Petitioners' other grounds.

## BACKGROUND

We first provide background information on ratemaking procedures, which includes an explanation of company rate base and its relevance to this case. We then

---

[1] Rule 1.1 was numbered as "Rule 1" in 2010, but subsequently was renumbered as "Rule 1.1." For consistency, we always refer to it as Rule 1.1. In addition, undesignated rule references are to the Commission's Rules of Practice and Procedure.

[2] References to decisions are to decisions of the Public Utilities Commission. We sometimes abbreviate "Decision No." as "D."

provide some of the history of the dispute between the Commission and Petitioners.  This background is necessary to understand the constitutional due process issue this case presents.

## I.      Ratemaking principles and procedures

The Commission supervises and regulates every public entity in California.  (Pub. Util. Code, § 701.)[3]  It is a constitutionally created body with broad regulatory powers, including the power to fix rates and to establish rules and procedures.  (Cal. Const., art. XII, §§ 2, 6; § 728.)  Telephone corporations, as are Petitioners, are public utilities under the law and are thus subject to the Commission's regulation and control.  (Cal. Const., art. III, § 3; § 216, subds. (a), (b).)

As this court has previously said about ratemaking:

> "The Commission periodically establishes the rates [a telephone company] charges for telephone service in general rate case proceedings using a cost-of-service or rate-of-return model.  Under this structure, the Commission examines the company's costs in a test year and determines the company's revenue requirement during that test year.

> "The Commission examines several cost components in calculating a utility company's revenue requirement.  The Commission begins by determining the value of the assets that the company has invested in to provide utility service.  Property or portions thereof that are unproductive for public utility purposes are excluded.  This figure is known as the 'rate base.'

> "To invest in rate base assets, a utility company raises funds by either issuing debt or selling equity.  Costs are associated with each method.  The company either has to pay interest to creditors on borrowed funds or pay a portion of profits or dividends to equity investors, i.e., shareholders.  This cost is known as the cost of capital.  The cost of capital, also known as the rate of return, multiplied by the rate base is

---

[3] Undesignated statutory references are to the Public Utilities Code.

one component of the utility company's revenue requirement." (*The Ponderosa Telephone Co. v. Public Utilities Com.* (2011) 197 Cal.App.4th 48, 51 (*Ponderosa*).)

This figure is added to the Company's operating expenses and tax costs to get "the company's revenue requirement, i.e., the amount needed to cover the company's costs and provide a reasonable return on its investments." (*Ponderosa, supra,* 197 Cal.App.4th at p. 52.)

## II.     The Rural Telephone Bank

This original proceeding stems from the dissolution of the RTB, an event this court has already examined in *Ponderosa, supra,* 197 Cal.App.4th 48.  Congress created the RTB in 1971 to provide low-cost debt financing to rural telephone companies at reasonable costs for investment in infrastructure. (*Id.* at p. 52.)  The RTB authorized and issued three types of stock:  Class A, B, and C.  Class A stock was issued to the Administrator of the Rural Utilities Service in exchange for the federal government's initial cash infusion of $600 million.  (*Ibid.*)

Petitioners acquired Class B stock in connection with their loans over more than 30 years.  Class B stock could be acquired in two ways.  First, as a condition of obtaining a loan from the RTB, "customers were required to purchase Class B stock in an amount equal to [five] percent of the RTB loan." (*Ponderosa, supra,* 197 Cal.App.4th at p. 52.)  Second, borrowers were "eligible to receive what the RTB called 'patronage funds' in the form of Class B stock.  These patronage shares were a partial rebate of the interest paid to the RTB and were distributed when the RTB determined that the interest it had received from its borrowers exceeded its costs.  A company's patronage refund was based solely on the dollar amount of interest it paid, not the number of Class B shares it held." (*Id.* at pp. 52—53.)  All Class B shares were nontransferable and paid no dividends. (*Id.* at p. 53.)

Class C stock could also be acquired in two ways.  "RTB customers could either make discretionary purchases of Class C shares or could convert Class B shares to

5.

C shares at any time after the RTB loan that necessitated the purchase of the Class B shares had been repaid." (*Ponderosa, supra,* 197 Cal.App.4th at p. 53.)

The RTB dissolved in 2005 and initiated the stock redemption process. Beginning in 2006, all Class B and C shares were redeemed at par value—$1 per share and $1,000 per share respectively. In November 2007, RTB distributed its remaining funds as residual amounts to all Class B shareholders at a rate of $0.04435 per share. (*Ponderosa, supra,* 197 Cal.App.4th at p. 53.)

### III.    Ratemaking treatment of the RTB stock

"The Commission did not explicitly address the appropriate ratemaking treatment of the RTB stock for the years 1972 through 1996. The first direct Commission action on this stock occurred 25 years after the telephone companies' initial loans when the Commission conducted general rate cases for most of those companies[,]" (*Ponderosa, supra,* 197 Cal.App.4th at p. 53), including for The Ponderosa Telephone Company and Petitioners.

In December 1995, Ponderosa, Kerman, and Volcano filed general rate case advice letters with the Commission pursuant to a Commission order to file general rate cases by the end of 1995. Sierra also filed a general rate case under that Commission order but elected to do so by filing a formal general rate case application rather than an advice letter.[4]

Ponderosa in its advice letter "proposed to include the Class B stock obtained with [five] percent of RTB loan proceeds in its rate base." (*Ponderosa, supra,* 197 Cal.App.4th at p. 53.) The Commission rejected this request in a 1997 resolution but

---

[4] Ponderosa, Kerman, Volcano, Happy Valley Telephone Company, Hornitos Telephone Company, Siskiyou Telephone Company, and Winterhaven Telephone Company each filed informal general rate case advice letters.

Calaveras Telephone Company, Cal-Ore Telephone Company, Ducor Telephone Company, Foresthill Telephone Company, and Sierra each filed formal general rate case applications. Foresthill did not own RTB stock.

ordered Ponderosa to file an application requesting the Commission to determine the appropriate ratemaking treatment for the gain on the RTB stock when those shares were redeemed. In 2004, the Commission authorized Ponderosa to include its purchased Class B shares in rate base. (*Ibid.*) Ponderosa accordingly earned a rate of return on those shares from January 1, 2004, until April 11, 2006. (*Ibid.*)

By contrast, neither Kerman nor Volcano proposed to include any of their stock in rate base in their 1995 general rate case advice letters. But as with Ponderosa, in 1997 resolutions, the Commission directed Kerman and Volcano to file an application when any stock is redeemed so the Commission can determine the appropriate ratemaking treatment for the gain on the redemption.

The Commission's order to Kerman read:

> "Kerman shall file an application, to determine the correct ratemaking treatment of any gain on redemption, if it redeems any RTB stock."

And the direction to Volcano read:

> "The Volcano Telephone Company shall file an application requesting the appropriate ratemaking treatment for the gain on the redemption of any RTB stock, when any RTB stock is redeemed."

The Commission issued a formal decision on Sierra's formal general rate case application in 1997. The decision referenced RTB stock only briefly and said nothing about a required ratemaking determination relative to ownership of RTB stock.

In 2006, the Commission issued a decision on allocation of gains on sale of public utility assets. "In that decision, D.06-05-041, as modified by D.06-12-043 (Gains on Sale Decision), the Commission determined that" "where property is never in rate base, all gains or losses should accrue to the shareholders." (*Ponderosa, supra,* 197 Cal.App.4th at p. 54.)

7.

## IV.     The 2007 ratemaking application

In December 2007, eleven rural telephone companies, including Petitioners, filed Application No. 07-12-026 ("Application") seeking a Commission ratemaking determination of the redeemed RTB stock. The Application stated it was being filed under ordering paragraphs in the 1997 rate case resolutions. The Application also stated that although not all eleven companies received orders to file a ratemaking application upon redemption of RTB stock, those companies still elected to join in the Application.

Five applicants—Ponderosa, Calaveras, Cal-Ore, Ducor, and Siskiyou—had stock in rate base for a period and had realized a gain on the stock redemption. They proposed to distribute a total of $3,037 of the gain to their ratepayers. The analysis they used to arrive at this figure considered many factors, including the time the companies owned the shares and the time they held the shares in rate base. The Application included a chart showing this analysis.

The Application also asserted that the applicants that never had shares included in rate base should have their redemption proceeds accrue to their shareholders and not their ratepayers. Petitioners were among the companies that never had shares in rate base. The Application quotes the Gains on Sale decision: "[W]here property is never in rate base, all gains or losses should accrue to shareholders."

Commission staff submitted data requests to all applicants requesting, among other things, each applicant's RTB full stock redemption proceed amounts. In response, the companies disclosed their respective proceed amounts, which totaled over $31 million.

## V.     Initial enforcement proceedings

In June 2010, in Decision No. 10-06-029, the Commission determined all the applicants' RTB stock redemption proceeds should be allocated to the applicants' ratepayers in the form of credits. D.10-06-029 also included an order to show cause why the applicants should not be subject to penalties for violating, in part, Rule 1.1 by failing

8.

to disclose the full amount of the redemption proceeds in the Application. Rule 1.1, among other things, prohibits a person who signs a pleading or brief to submit to the Commission from misleading the commission or its staff "by an artifice or false statement of fact or law."

The companies applied for rehearing of D.10-06-029, which the Commission denied. Ponderosa challenged the decision in an original proceeding in this court in *Ponderosa, supra,* 197 Cal.App.4th 48. The 10 other applicants in the Application were included as real parties in interest. (*Ibid.*) In July 2011, this court issued its opinion in *Ponderosa* annulling D.10-06-029. (*Id.* at p. 51.) We explained that the Commission erred in allocating Ponderosa's share proceeds to its ratepayers and remanded for a reallocation of Ponderosa's Class B share redemption proceeds consistent with our opinion. (*Id.* at pp. 51, 64.) Our opinion also observed that, under the Gains on Sale Decision, all gains and losses from the sale of public utility company property that was never in rate base accrue to the shareholders. (*Id.* at p. 57.)

## VI. Penalties imposed

In March 2011, before the *Ponderosa* opinion issued, the Commission issued Decision No. 11-03-030 in which it fined the eleven applicants a total of $355,000 for, in part, violating Rule 1.1. Eight applicants, including Petitioners, filed a rehearing application for that decision, which the Commission granted in Decision No. 11-12-057.

In October 2015, the assigned commissioner issued an amended scoping memorandum to address, among other things, the rehearing of the March 10, 2011, decision (D.11-03-030). In June 2017, the assigned commissioner and administrative law judge issued an order to show cause ruling. The ruling ordered the eight respondents to show why they should not be sanctioned for violating:

> "Rule 1.1 [of the Commission's Rules of Practice and Procedure] for [failing] to disclose [RTB] stock redemption proceeds included as revenue, as well as the resulting actual rate of return realized by [Respondents] in the year they received the proceeds from the [RTB] stock redemption."

9.

The Commission held an 11-day evidentiary hearing, received written briefing, and heard oral argument. On December 30, 2019, the Commission issued Decision No. 19-12-041 ("Penalty Decision"). The Penalty Decision found that the eight respondents violated Rule 1.1 by failing to disclose in the Application the full amount of the stock redemption proceeds. The Penalty Decision stated that the Commission's 1997 rate case resolutions provided adequate notice of a "duty to disclose the full amount of RTB redemption proceeds" in the Application. It also said the failure to disclose was material because it prevented the Commission from making "an equitable, just and reasonable ratemaking determination," and "foreclose[d] the Commission's options to determine for itself what ratemaking treatment to apply to the stock." The Commission imposed penalties on the respondents totaling $2,752,000. After adjusting for the individual companies' financial resources, Volcano and Sierra each received net penalties of $216,649 and Kerman received a net penalty of $198,600.[5]

The respondents petitioned for a rehearing of the Penalty Decision, which the Commission denied in Decision No. 22-01-018 ("Decision Denying Rehearing") in January 2022. The Decision Denying Rehearing did not modify the findings, conclusions, or reasoning of the Penalty Decision.

## VII. Petition for writ of review

Petitioners timely filed a petition for a writ of review challenging the lawfulness of the Penalty Decision and Decision Denying Rehearing. The Commission filed an answer, to which Petitioners filed a reply. We granted the petition.

"Under section 1756, this court has jurisdiction to review Commission decisions through petitions for writ of review. (§ 1756, subd. (a).) Such review is discretionary rather than mandatory. [Citation.] Nevertheless, because petitions for writ of review

---

[5] All eight companies subjected to the Rule 1.1 enforcement action were penalized $344,000. After applying credits and offsets, the five companies besides the Petitioners received net penalties of $221,649.

serve in effect as appeals, they are not to be summarily denied on policy grounds unrelated to their merits." (*Ponderosa, supra,* 197 Cal.App.4th at pp. 55—56.)

This court's review of the [Penalty Decision and Decision Denying Rehearing] is governed by section 1757. That section permits a reviewing court in an enforcement proceeding to determine whether a Commission decision violates any of the petitioner's rights under the state or federal constitutions. (§ 1757, subd. (a)(6).) Petitioners state as a basis for relief in their petition that the Decisions violate their state and federal constitutional due process rights by penalizing them without fair notice of their obligation to disclose their RTB stock redemption proceeds in the 2007 Application. They state their due process claims are rooted in both the Fourteenth Amendment to the United States Constitution and in Article 1, section 7 of the California Constitution.

The petition states several other bases for relief from the Decisions, none of which we need reach.

## DISCUSSION

### I. Standard of review

"[T]he Commission is not an ordinary administrative agency, but[] rather is a constitutional body with broad legislative and judicial powers. Accordingly, the Commission's decisions are presumed valid." (*Ponderosa, supra,* 197 Cal.App.4th at p. 56.) But where a Commission decision is challenged on the ground that it violates a constitutional right—whether under the federal or state Constitution—the reviewing court must exercise independent judgment on the law and the facts, and the Commission's findings or conclusions material to the determination of the constitutional question will not be final. (§ 1760.)

### II. Due Process

Petitioners claim as a basis for relief in their petition that the Penalty Decision and Decision Denying Rehearing violate their due process rights under both the federal and

11.

state constitutions, but they cite only federal due process principles in their supporting memorandum.  Thus, we decide Petitioners' claim under federal law only.**6**

The Due Process Clause of the Fifth Amendment to the United States Constitution guarantees that "[n]o person shall be … deprived of life, liberty, or property without due process of law."  A similar requirement that no "State [shall] deprive any person life, liberty, or property without due process of law" is contained in the Fourteenth Amendment.

The Supreme Court of the United States has held that under due process principles, "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." (*F.C.C. v. Fox Television Stations, Inc.* (2012) 567 U.S. 239, 253 (*Fox*).)  In the administrative law context, the failure to give fair notice to a regulated entity of what is forbidden or required justifies vacating the imposed punishment resulting from the alleged violation of a regulation.  (*Fox, supra,* 567 U.S. at pp. 254—258; *Trinity Broadcasting of Florida, Inc. v. F.C.C.* (D.C. Cir. 2000) 211 F.3d 618, 619; *General Elec. Co. v. U.S. E.P.A.* (D.C. Cir. 1995) 53 F.3d 1324, 1330; *Gates & Fox Co., Inc. v. Occupational Safety and Health Review Com'n* (D.C. Cir. 1986) 790 F.2d 154, 156.)  The Supreme Court has defined the fair notice standard generally:  a punishment violates "due process if the statute or regulation under which it is obtained 'fails to provide a person of ordinary intelligence fair notice of what is prohibited[.]' " (*Fox, supra,* 567 U.S. at p. 253.)  More specifically in the administrative context, the Due Process Clause requires that agencies bringing an enforcement action "provide," through written guidance, regulations, or other activity, "a person of ordinary intelligence fair notice of" what is prohibited or required.  (*Id.* at pp. 253—254.)

---

**6** There is, however, California authority requiring adequate notice regarding the imposition of administrative penalties under due process principles.  (See, e.g., *Tafti v. County of Tulare* (2011) 198 Cal.App.4th 891, 896-902.)

12.

It makes no difference that Petitioners were penalized for violating an agency rule instead of a statute or regulation because the fair notice standard applies just the same. No matter the type of law an agency is enforcing, regulated parties are always entitled to fair notice of what is prohibited or required before they can be punished for a violation. These due process concerns are implicated here because Petitioners claim they did not have fair notice that they had to disclose the redemption proceed amounts. We agree Petitioners did not have fair notice of this requirement. The Commission's 1997 rate case resolutions informed Petitioners that they were required to file an application when any RTB stock was redeemed to determine the ratemaking treatment of the gain on the redemption.[7] But the resolutions did not expressly require that Petitioners disclose the full amount of the redemption proceeds in the application. Indeed, nothing in the record shows Petitioners were expressly informed that they must disclose the full amount of the proceeds in the application.

The question then is whether Petitioners still received fair notice of the disclosure requirement from the Commission despite not receiving express notice. We conclude they had no basis to infer any disclosure requirement. In its 2006 Gains on Sale Decision, issued about a year and half before Petitioners filed the Application, the Commission determined that where public utility property is never in rate base, all gains and losses from the sale of such property should accrue to the shareholders.[8] This decision thus instructed Petitioners that since none of their RTB stock was ever in rate

---

[7] Recall that the Commission never ordered Sierra to file an application upon redemption of any of its RTB stock. But we need not determine the legal significance of that fact. Our analysis proceeds as if Sierra had received the same notice as Kerman and Volcano concerning the requirement to file an application upon the redemption of any RTB stock.

[8] In D.10-06-029, the subject decision in *Ponderosa, supra,* 197 Cal.App.4th 48, the Commission "noted that the RTB stock was a public utility asset and the 2006 redemption amounted to a sale of this asset." (*Ponderosa,* at p. 55.)

base, all of the proceeds from the redemption—whether characterized as gains or losses—accrued to the shareholders. (*Ponderosa, supra,* 197 Cal.App.4th at p. 57 [confirming this understanding].) The proceed amounts were immaterial to a ratemaking determination because no other ratemaking treatment would have been lawful, whether or not Petitioners disclosed all of their proceeds. The Commission's lack of direction to Petitioners about the requirement to disclose the redemption proceed amounts in the Application even if no shares were ever in rate base " 'fail[ed] to provide a person of ordinary intelligence fair notice of what is [required].' " (*Fox, supra,* 567 U.S. at p. 254.) The penalties imposed on Petitioners violate due process and must be annulled.

The Commission's arguments are unpersuasive. It contends that the Application "necessarily need[ed] to disclose the full amounts of the redemption" of the RTB stock "so that the Commission could make an informed and reasonable ratemaking determination regarding the RTB proceeds." The Commission also maintains that Petitioners have failed " 'to persuasively show why the Commission would need or want less than full disclosure of all proceeds from the redemptions' " of RTB stock.

These related points can be addressed together. We just explained how Petitioners' redemption proceed amounts were irrelevant to a ratemaking determination because Petitioners' shares were never in rate base. All gains or losses on the redemption accrued to Petitioners' shareholders, not the ratepayers. No other allocation was legally allowed. Thus, in Petitioners' cases, it is not true that the Commission "necessarily need[ed]" to know the full amount of Petitioners' redemption proceeds to make an accurate ratemaking determination. The Commission should have instructed Petitioners to disclose their redemption proceeds in the Application if that is what the Commission wanted from Petitioners. But the Commission did not give fair notice to Petitioners of this disclosure requirement and penalized them for essentially failing to intuit the disclosure requirement. Petitioners' penalties must be annulled as a violation of due process.

14.

## DISPOSITION

The Penalty Decision ((D.19-12-041) and the Decision Denying Rehearing (D.22-01-018) are annulled as to Petitioners. Petitioners are awarded their costs on appeal.


SNAUFFER, J.

WE CONCUR:


FRANSON, Acting P. J.


SMITH, J.

15.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| KERMAN TELEPHONE CO., et al., <br><br> Petitioners, <br><br> v. <br><br> PUBLIC UTILITIES COMMISSION, <br><br> Respondent; <br><br> PUBLIC ADVOCATES OFFICE AT THE PUBLIC UTILITIES COMMISSION, <br><br> Real Party in Interest. | F083940 <br><br> (CPUC Decision Nos. 19-12-041 & 22-01-018) <br><br><br> **ORDER GRANTING REQUEST FOR PUBLICATION** |

As the nonpublished opinion filed on August 7, 2023, in the above entitled matter hereby meets the standards for publication specified in the California Rules of Court, rule 8.1105(c), it is ordered that the opinion be certified for publication in the Official Reports.

SNAUFFER, J.

WE CONCUR:

FRANSON, Acting P. J.

SMITH, J.

.